IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ROBERT DALE ALEXANDER,

                     Plaintiff,                              6:11-cv-06215-PK

v.                                              OPINION AND ORDER

MAX WILLIAMS et al.,

                     Defendants.

PAPAK, Magistrate Judge:

      On June 22, 2011, incarcerated plaintiff Robert Dale Alexander filed this action *pro se*

against twenty-eight defendants in their individual and official capacities. Defendants are

doctors, nurses, and administrators for the Oregon Department of Corrections ("ODOC").[1] In his

_____

     [1] On September 24, 2013, the court granted plaintiff's motion to voluntarily dismiss
defendants Teresa Hicks, J. Hansen, B. Cullers, and David Gillies. Moreover, after a thorough
review of the complaint, I find that plaintiff has failed to allege any facts regarding defendant A.
Clements. Accordingly, I shall grant defendants' motion for summary judgment to the extent it

Page 1 - OPINION AND ORDER

complaint, plaintiff alleges that defendants are liable under 42 U.S.C. § 1983 for violating his

rights arising under the Eighth Amendment to the United States Constitution.[2]  Specifically,

under Claim I, plaintiff alleges that defendants[3] were deliberately indifferent to his medical

needs when they failed to adequately manage his pain caused by a lumbar-spine condition and

delayed lumbar-spine surgery.  Under Claim II, plaintiff alleges that defendants[4] were

deliberately indifferent to his medical needs when they failed to adequately manage his pain

caused by a cervical-spine condition and delayed cervical-spine surgery.  Under Claim III,

plaintiff alleges that the defendants[5] on the Therapeutic Level of Care Committee ("TLCC")

were deliberately indifferent to his medical needs when they denied plaintiff surgery and pain

medication.  Under Claim IV, plaintiff alleges that the defendants[6] in supervisory positions were

deliberately indifferent to his medical needs when they failed to adequately address his

seeks summary judgment as to any claims against Clements.

     [2]  Plaintiff also alleges claims under the Fourteenth Amendment.  Because plaintiff's
claims are premised on defendants' alleged deliberate indifference, however, I shall construe
plaintiff's claims as arising under the Eighth Amendment.

     [3]  Defendants Dr. Garth Gulick, Dr. John Vargo, Dr. Ole Hansen, Dr. Jerry Becker, Nurse
Practitioner Linda Gruenwald, Max Williams, Michael Gower, Dr. Steven Shelton, Bill Hoefel,
and Shirley Hodge are named in Claim I.

     [4]  Defendants Dr. Gulick, Dr. Vargo, Dr. Hansen, Dr. Becker, Nurse Gruenwald,
Williams, Gower, Dr. Shelton, Hoefel, Hodge, Mark Nooth, Jeff Premo, and Nurse Juanda
Myers are named in Claim II.

     [5]  Defendants Dr. Shelton, Dr. Vargo, Dr. George Degner, Dr. Hansen, Dr. Michael
Peurini, Ted Randall, Sean Elliot, Harold McLain, Beverly Smith, Robert Snider, Dr. Gulick,
and Dr. Elliot-Blakeslee are named in Claim III.  I note that, on October 25, 2013, defendants
filed a notice that Dr. Elliot-Blakeslee died during the pendency of this action.  *See* Notice of
Suggestion of Death Upon the Record, #109, at 1.

     [6]  Defendants Randall, Williams, Gower, Shelton, Hoefel, Nooth, Hodge, and Premo are
named in Claim IV.

communications alerting them to his pain and need for surgery.  Finally, under Claim V, plaintiff

alleges that defendants[7] were negligent in failing to provide plaintiff with medical care.  This

court has federal-question jurisdiction over plaintiff's federal claims pursuant to 28 U.S.C. §

1331.

    Now before the court is defendants' motion for summary judgment (#65).  I have

considered the motion, supporting declarations and exhibits, and all of the pleadings on file.  For

the reasons set forth below, defendants' motion is granted.

**BACKGROUND**[8]

    On May 18, 1994, plaintiff was committed to the custody of ODOC with a life sentence.

Affidavit of Steven Shelton, M.D. ("Shelton Aff.") ¶ 10.  In 2006, plaintiff suffered a

weightlifting injury.  *Id.* ¶ 11.  Plaintiff's complaint alleges that, between December

2006—shortly after his injury—and June 2011—when he filed his complaint—he received

inadequate medical care at various ODOC facilities, including the Snake River Correctional

Institute ("SRCI"), the Oregon State Penitentiary ("OSP"), and the Two Rivers Correctional

Institute ("TRCI").

## I.    SRCI: December 2006 to February 27, 2008

    In December 2006, while housed at SRCI, plaintiff began seeing Dr. Gulick regarding

pain in plaintiff's lumbar spine.  Complaint at 6.  During his initial visit, Dr. Gulick refused to

---

    [7] Defendants Dr. Gulick, Dr. Vargo, Dr. Hansen, Dr. Becker, Nurse Gruenwald,
Williams, Gower, Dr. Shelton, Hoefel, Nooth, Nurse Myers, Nurse Patrick Hinkleman, Nurse
Pam Young, and Premo are named in Claim V.

    [8] Except where otherwise indicated, the following recitation constitutes my construal of
the evidentiary record in light of the legal standard governing motions for summary judgment
under Federal Rule of Civil Procedure 56.

examine plaintiff and only suggested that plaintiff take Tylenol and ibuprofen to treat his lumbar-spine pain.  *Id.*  Although plaintiff alleges that Dr. Gulick refused to treat plaintiff's lumbar-spine condition between December 2006 and February 27, 2008, *id.*, plaintiff's medical records indicate that he was on various pain medications during this period of time, including Feldene, naproxen, MS Contin, Neurontin, and Vicodin.[9]  *See* Physician's Orders, Att. 2, Shelton Aff., at 41-44, 47-48; Medication Administration Records, Att. 2, Shelton Aff., at 199-210.

While at SRCI, plaintiff also sought treatment for headaches and pain in his cervical spine, neck, shoulder, and wrist.  Complaint at 19-20.  On January 14, 2007, plaintiff saw Dr. Gulick, who refused to perform any type of examination and told plaintiff that "he was only after medication."  *Id.* at 20.  On February 20, 2007, plaintiff saw Dr. Ishida, who "made an attempt to provide [p]laintiff with medical treatment."  *Id.*  Nevertheless, plaintiff maintains that he was in constant pain.  *Id.*  In September 2007—approximately nine months after plaintiff first complained of pain in his cervical spine, neck, shoulder, and wrist—Dr. Gulick prescribed MS Contin to treat plaintiff's pain.  *Id.*; Physician's Orders, Att. 2, Shelton Aff., at 47.  From September 2007 until plaintiff was transferred to OSP, he was consistently on MS Contin, Neurontin, or Vicodin, or some combination thereof.  *See* Physician's Orders, Att. 2, Shelton Aff., at 41-44, 47-48; Medication Administration Records, Att. 2, Shelton Aff., at 199-210.

---

[9]  Defendants did not submit plaintiff's Medication Administration Records prior to October 2007.  Both the Progress Notes and Physician's Orders, which are attached to Dr. Shelton's affidavit as attachment 2, pages 99 through 197 and 42 through 98, respectively, are oftentimes illegible and, thus, it is difficult to discern what medications plaintiff was on prior to October 2007.  From my review of the records, it appears that plaintiff was on Feldene, an NSAID pain reliever, from approximately December 28, 2006, to January 26, 2007, and naproxen, an NSAID pain reliever, from approximately February 20, 2007, to April 10, 2007.  Beginning September 11, 2007, until he was transferred to OSP, plaintiff was consistently taking MS Contin, Neurontin, and/or Vicodin.

In July 2007, Dr. Gulick diagnosed plaintiff with possible right ulnar neuropathy and requested that the TLCC, "a committee of physicians that meets on a weekly or biweekly basis to discuss case management and proposed treatment plans for inmates," approve an electromyogram ("EMG").  Shelton Aff. ¶¶ 5, 11; *see also* Complaint at 20 (stating that it took Dr. Gulick "almost 7 months" before sending plaintiff out for testing); TLCC Records, Att. 2, Shelton Aff., at 287.  The TLCC approved the request on August 10, 2007.  TLCC Records, Att. 2, Shelton Aff., at 287.  Plaintiff contends that, although Dr. Gulick eventually sent plaintiff out for testing, "Dr. Gulick only ordered tests for [p]laintiff's right arm, when [p]laintiff's complaints were for his left side."  Complaint at 20.

On December 10, 2007, plaintiff saw Dr. John D. Foote, a consulting orthopedic surgeon, who diagnosed plaintiff with cervical spondylosis, right carpal tunnel syndrome, and cubital tunnel syndrom.  Shelton Aff. ¶¶ 11-12; TLCC Records, Att. 2, Shelton Aff., at 292.  Dr. Foote indicated that plaintiff would likely benefit from ulnar nerve transposition, as well as possible carpal tunnel release.  TLCC Records, Att. 2, Shelton Aff., at 292.  Dr. Foote noted, however, that plaintiff stated "his neck is the most pressing issue to him."  *Id.*  Dr. Foote talked with plaintiff regarding "some conservative measures" to treat his condition and indicated that he would see plaintiff again after plaintiff's spine surgery.  *Id.*

Following plaintiff's appointment with Dr. Foote, Dr. Gulick requested that the TLCC approve right carpal tunnel and ulnar surgery, which the TLCC approved on December 19, 2007. TLCC Records, Att. 2, Shelton Aff., at 293.

On December 21, 2007, plaintiff saw Dr. Kenneth Little, a consulting neurosurgeon, who diagnosed plaintiff with ulnar neuropathy, radiculopathy, and carpal tunnel syndrome.  Shelton

Aff. ¶¶ 11-12; TLCC Records, Att. 2, Shelton Aff., at 295-97.  Dr. Little proposed a "C5-C6 anterior cervical microdiskectomy and fusion with external bone graft, as well as the right ulnar nerve decompression and right carpal tunnel release."  TLCC Records, Att. 2, Shelton Aff., at 297.

"On multiple occasions[,] Dr. Gulick assured [p]laintiff that he would be receiving wrist, elbow, and neck surgeries."  Complaint at 20.  Sometime in late January or early February, plaintiff "gave blood and urine samples, then [filled] out a hospital admittance form in preparation for the surgeries."  *Id.*; *see also* TLCC Records, Att. 2, Shelton Aff., at 299-308 (plaintiff's hospital admittance forms); Ex. 3, Resistance to Motion for Summary Judgment, at 1-10 (plaintiff's hospital admittance forms).  On February 27, 2008[10]—the date that plaintiff was to receive surgery in Boise, Idaho—plaintiff was transferred to OSP.  Complaint at 21; Ex. 3, Resistance to Motion for Summary Judgment, at 2 (showing a scheduled surgery date of February 27th).

## II.   OSP: February 27, 2008, to February 26, 2009

Upon his arrival at OSP, plaintiff attempted to see Dr. Vargo "to find out what was going on with the treatment" and to seek treatment for his lumbar-spine condition, which continued to cause him pain.  Complaint at 21; *see also id.* at 6.  Dr. Vargo, however, refused to see plaintiff from February 27, 2008, when plaintiff arrived, to September 2008.[11]  *Id.*  Although plaintiff also alleges that Dr. Vargo allowed plaintiff's pain medication to expire during this period, it appears

---

[10]  Plaintiff's complaint indicates January 27, 2008.  However, this appears to be a typographical error, as plaintiff was not transferred until February 27, 2008.

[11]  Plaintiff later alleges that Dr. Vargo would only see him once during this period. Complaint at 41.

that from February 2008 through September 2008, plaintiff was consistently on Neurontin and, at times, Vicodin.  *See* Physician's Orders, Att. 2, Shelton Aff., at 54-55, 58; Medication Administration Records, Att. 2, Shelton Aff., at 209-16.[12]  Indeed, it appears as though the prescribed dosage of Neurontin actually increased during a portion of this period.  *See* Medication Administration Records, Att. 2, Shelton Aff., at 212-13 (showing an increase from 600 mg to 800 mg).

On March 24, 2008, plaintiff saw Dr. Robert Buza, a consulting neurosurgeon.  TLCC Records, Att. 2, Shelton Aff., at 311-13; *see also* Complaint at 21.  Dr. Buza recommended a "nerve conduction velocity, EMG of the left arm and an MRI of the lower lumbar spine."  TLCC Records, Att. 2, Shelton Aff., at 312.  These were the tests that Dr. Gulick failed to order in 2007.  Complaint at 21.  In accordance with Dr. Buza's recommendation, plaintiff saw Dr. Michael Wynn, a consulting neurologist, who "performed an EMG/NCV and concluded that the study was abnormal, with moderate to severe median compression at the wrist" on May 15, 2008.[13]  Shelton Aff. ¶ 14; TLCC Records, Att. 2, Shelton Aff., at 314-18.

On July 7, 2008, plaintiff saw Dr. Buza again.  Shelton Aff. ¶ 15; TLCC Records, Att. 2, Shelton Aff., at 321-22.  "Dr. Buza recommended decompression of the median nerve on the left side, although he noted that a worsening of [plaintiff's] condition was unlikely."  Shelton Aff. ¶

---

[12]  I note that the Medication Administration Records for May 2008 and September 2008 are missing from the record.  Nevertheless, the Physician's Orders show that plaintiff was prescribed Neurontin on April 28, 2008, for two months, on June 20, 2008, for three months, and on September 16, 2008, for six months.  *See* Physician's Orders, Att. 2, Shelton Aff., at 54-55, 58.

[13]  Although Dr. Shelton's affidavit suggests that plaintiff saw Dr. Wynn on May 16, 2008, this appears to be a typographical error as Dr. Wynn's report shows an appointment date of May 15, 2008.

15; *see also* TLCC Records, Att. 2, Shelton Aff., at 321-22.  In early August 2008, the TLCC

approved carpal tunnel surgery, which Dr. Buza performed on August 28, 2008.  Shelton Aff. ¶

16; TLCC Records, Att. 2, Shelton Aff., at 323-27.

 In September 2008, plaintiff began seeing Dr. Hansen.  Complaint at 7, 21; *see also*

Shelton Aff. ¶ 18.  Although plaintiff saw Dr. Hansen numerous times regarding his lumbar-

spine condition and his cervical-spine condition, plaintiff's pain persisted.  Complaint at 7, 21-

22; Shelton Aff. ¶¶ 18-19.  "Dr. Hansen did make an effort to treat plaintiff's headaches,"

apparently by prescribing Midrin.  Complaint at 22; Medication Administration Records, Att. 2,

Shelton Aff., at 220.  On October 28, 2008, Dr. Hansen issued plaintiff an elevator pass that

would allow plaintiff to access the infirmary without using the stairs.  Complaint at 7.

"However, Dr. Hansen would not put plaintiff on stair restrictions," which forced plaintiff to

climb five flights of stairs "every time he left his cell for meals, doctor appointments, etc."  *Id.*

As a result of this, "[p]laintiff missed meals, showers and clean clothes, as well as medication

lines."  *Id.*  The Medication Administration Records for November and December 2008 appear to

show several times that plaintiff missed taking his medications.  Medication Administration

Records, Att. 2, Shelton Aff., at 220, 222.

 On November 28, 2008, plaintiff received an MRI of his lumbar spine, "which showed a

small right-sided disc protrusion at L5-S1 with mild right lateral recess narrowing" and a "2.3 cm

mass within the left psoas muscle."  Shelton Aff. ¶ 20; *see also* TLCC Records, Att. 2, Shelton

Aff., at 331.  Following the MRI, plaintiff saw Dr. Buza again.  Complaint at 7; TLCC Records,

Att. 2, Shelton Aff., at 333-37.  Dr. Buza recommended "first addressing the lumbar spondylosis

before proceeding with spinal fusion and decompression."  Shelton Aff. ¶ 21; TLCC Records,

Att. 2, Shelton Aff., at 336-37.

On January 14, 2009, a fellow inmate attacked plaintiff, stabbing him four times. Complaint at 22; Shelton Aff. ¶ 23.  "Due to [p]laintiff's untreated medical conditions[,] [p]laintiff was unable to defend himself."  Complaint at 22.  Following the incident, medical staff "had an x-ray done of [plaintiff's] chest and prescribed medication for his pain.  No holes in the lung cavity were discovered."[14]  Shelton Aff. ¶ 23.

On January 27, 2009, plaintiff received an x-ray of his cervical and lumbar spine, which showed "mild degeneration."  Shelton Aff. ¶ 24; TLCC Records, Att. 2, Shelton Aff., at 339-40. That same date, plaintiff saw Dr. Jerry Becker, an orthopedic surgeon.  Complaint at 22; Shelton Aff. ¶ 25.  Despite the fact that plaintiff explained that he was uncomfortable being examined in a public area after his recent attack, Dr. Becker performed the examination in a public area. Complaint at 22.  Following the examination, Dr. Becker described plaintiff as having a "histrionic personality" and concluded that plaintiff should not receive surgery for the cervical or lumbar spine "unless dependable, objective, and consistent findings of nerve root compromise at a specific level were documented."  Shelton Aff. ¶ 25 (internal quotation mark omitted). Consistent with Dr. Becker's recommendation, the TLCC determined surgery was not necessary but "recommended that Dr. Hansen and Dr. Buza continue to discuss [plaintiff's] treatment and return to [the] TLCC if strong evidence indicated the need for further treatment."  *Id.* ¶ 26; *see also* Complaint at 36 (noting that the TLCC denied plaintiff surgery on February 5, 2009).

---

[14]  It is not clear what pain medication the medical staff prescribed.  It appears from the Medication Administration Records that plaintiff was already on both Neurontin and Vicodin before he was attacked on January 14, 2009.  Medication Administration Records, Att. 2, Shelton Aff., at 224.

**III.     TRCI: February 26, 2009, to May 19, 2009**

On February 26, 2009, plaintiff was transferred to TRCI.  Complaint at 23.  Although plaintiff describes the transfer as a "shock," *id.*, Dr. Shelton contends that plaintiff was transferred to TRCI "for a dental appointment," Shelton Aff. ¶ 27.  Upon his arrival at TRCI, plaintiff began seeking treatment for his lumbar-spine condition and his cervical-spine condition.  Complaint at 9, 23.  Soon after he arrived at TRCI, "a Health Services provider noted that [plaintiff] 'ambulates with steady gait across day room to med line, turns head left and right looking around and talking to other inmates and staff, stands with most of his body weight on right leg.  Left leg stepped forward, leans back onto right hip.  No signs or symptoms of discomfort although asks for pain med.'"  Shelton Aff. ¶ 28, *quoting* Progress Notes, Att. 2, Shelton Aff., at 122.  On March 13 or 14, 2009, Nurse Gruenwald discontinued plaintiff's prescription for hydrocodone.  Complaint at 23; Physician's Orders, Att. 2, Shelton Aff., at 64; Medication Administration Records, Att. 2, Shelton Aff., at 229.  Plaintiff continued to take Neurontin for the entire month of March.  Medication Administration Records, Att. 2, Shelton Aff., at 229.

On April 15, 2009, plaintiff saw Nurse Gruenwald regarding pain in his cervical and lumbar spine.[15]  Complaint at 9, 23.  Nurse Gruenwald "denied [p]laintiff access to a doctor, then smacked [p]laintiff on the top of the head and told [p]laintiff that there was nothing wrong with him." *Id.* at 24; *see also id.* at 9.  The following day, plaintiff's prescription for Neurontin was discontinued.  *Id.* at 10; Medication Administration Records, Att. 2, Shelton Aff., at 231.  According to the Physician's Order discontinuing the medication, plaintiff was caught

---

[15]   I note that there is no record of this appointment.

"cheeking" the medication.  Physician's Orders, Att. 2, Shelton Aff., at 65; *see also* Shelton Aff. ¶ 29 (noting "non-compliance with Neurontin").  Plaintiff, however, believes his medication was discontinued "in retaliation for [p]laintiff seeking treatment so often."  Complaint at 24; *see also id.* at 10.  After plaintiff's prescription for Neurontin was discontinued, plaintiff suffered "serious [withdrawal] symptoms."  *Id.* at 24; *see also id.* at 10.

Plaintiff continued to seek treatment for his cervical-spine and lumbar-spine conditions, and, on April 29, 2009, he saw Nurse Gruenwald again.  Complaint at 10, 24-25; Shelton Aff. ¶ 29; Progress Notes, Att. 2, Shelton Aff., at 123-24.  Plaintiff alleges that Nurse Gruenwald denied his request to see a doctor and "again smacked [p]laintiff on top of his head and told plaintiff that there was nothing wrong with him."  Complaint at 24; *see also id.* at 10.  Nurse Gruenwald told plaintiff that he would be receiving exercises for his lower back, although plaintiff told Nurse Gruenwald that he had done the exercises previously and they had made his condition worse.  *Id.* at 10, 25.  Nurse Gruenwald also prescribed Indocin (or indomethacin), an NSAID pain reliever.  Physician's Orders, Att. 2, Shelton Aff., at 65; Progress Notes, Att. 2, Shelton Aff., at 124.  Although she noted there was "no real strong evidence of organic nerve root compression," she referred the case to the TLCC.  Progress Notes, Att. 2, Shelton Aff., at 124.  On May 5, 2009, the TLCC reviewed Nurse Gruenwald's referral and opted to have Dr. Gehling, another neurosurgeon, review plaintiff's most recent MRI.  Shelton Aff. ¶ 30; TLCC Records, Att. 2, Shelton Aff., at 344.

On May 7, 2009, plaintiff received the exercises.  Complaint at 11, 25.  Although plaintiff performed the exercises as instructed, they "made [p]laintiff's lumbar spinal condition and pain worse."  *Id.* at 11; *see also id.* at 25 (noting that the exercises also made his neck pain

worse).  On May 12, 2009, medical staff found plaintiff "unresponsive in the yard with a small amount of vomit noted on the corner of his mouth."  Shelton Aff. ¶ 31; *see also* Complaint at 11, 25.  Plaintiff awoke in the emergency room "soaked in urine and covered in blood."  Complaint at 11; *accord id.* at 25.  "The emergency room physician noted that [plaintiff's] radiculopathy symptoms could cause pain that might have resulted in fainting."  Shelton Aff. ¶ 31; *see also* Complaint at 11, 25 (noting that plaintiff passed out from pain).

When plaintiff returned to TRCI, he was "stripped naked and placed into a cell without a blanket[ or] pillow."  Complaint at 11; *accord id.* at 25.  Nurse Gruenwald "forcibly removed" the cervical collar plaintiff had received at the emergency room and discontinued the pain medication the emergency-room physician had given him.  *Id.* at 11; *accord id.* at 25.  Plaintiff remained on "suicide watch" from May 13 to May 14, 2009.  Shelton Aff. ¶ 32.  On May 14, 2009, plaintiff was returned to his cell.  Complaint at 11-12, 26.  Following the May 12, 2009 incident, plaintiff continued to be in pain but Nurse Gruenwald refused to see him.  *Id.*

## IV.    SRCI: May 19, 2009, to September 24, 2009

On May 19, 2009, plaintiff was transferred from TRCI to SRCI.  *Id.* at 12, 26; Shelton Aff. ¶ 33.  Shortly after he arrived at SRCI, plaintiff saw Dr. Gulick regarding his lumbar-spine condition, his headaches, and his cervical-spine condition.  Complaint at 12, 26.  Dr. Gulick did not get out of his chair and stated, "'It sure is hard to get medical attention when you assault staff.'"  *Id.* at 12; *accord id.* at 26.  Despite plaintiff's allegation that Dr. Gulick refused to treat plaintiff, Dr. Gulick requested that the TLCC approve "a repeat MRI."  Shelton Aff. ¶ 34; *see also* TLCC Records, Att. 2, Shelton Aff., at 352.  The TLCC approved the request.  Shelton Aff. ¶ 34.  Meanwhile, Dr. Gulick failed to adequately treat plaintiff's pain.  Complaint at 12, 26.

On June 2, 2009, the TLCC also approved an EMG and NCV study, which Dr. Steven

Asher, a neurologist, performed on June 22, 2009. *Id.* at 26; Shelton Aff. ¶ 36; TLCC Records,

Att. 2, Shelton Aff., at 354-57. "The tests showed mild carpal tunnel in both the left and right

wrists, normal ulnar nerves left and right elbows, and some evidence of chronic left cervical C7-

C8 radiculopathy."[16] Shelton Aff. ¶ 36; *see also* TLCC Records, Att. 2, Shelton Aff., at 357. Dr.

Asher recommended "obtaining [a] cervical spine MRI examination with special attention to the

left C7-8 nerve root" and, with regard to plaintiff's carpal tunnel syndrome in both wrists, Dr.

Asher recommended a "hand surgical evaluation." TLCC Records, Att. 2, Shelton Aff., at 355.

## V.    OSP: July 1, 2009, to August 12, 2009

On July 1, 2009, plaintiff was transferred from SRCI to OSP. Complaint at 27; Shelton

Aff. ¶ 36.[17] According to Dr. Shelton's affidavit, plaintiff was transferred to OSP "for easier

comparison of ordered MRI with prior MRIs." Shelton Aff. ¶ 36. Plaintiff states that the nine-

and-one-half-hour bus ride caused him "to suffer a substantial amount of pain," requiring a five-

day recovery. Complaint at 13.

During the six weeks that plaintiff was at OSP, plaintiff saw Dr. Hansen three times to

request treatment for pain in his cervical and lumbar spine. Although plaintiff alleges that "Dr.

Hansen denied [him] treatment for pain each time," *id.* at 27, it appears that plaintiff was still

prescribed indomethacin through July and August 2009. Medication Administration Records,

---

[16] Based on Dr. Asher's findings, it is not clear whether the August 28, 2008 carpal
tunnel surgery on plaintiff's left wrist was successful.

[17] Dr. Shelton's affidavit states that plaintiff was transferred on June 30, 2009.

Att. 2, Shelton Aff., at 236-38.[18]

On August 3, 2009, plaintiff received an MRI of his cervical and lumbar spine.

Complaint at 27; Shelton Aff. ¶ 39; TLCC Records, Att. 2, Shelton Aff., at 361-63.  With regard

to the cervical-spine MRI, "[t]he cervical cord appeared intrinsically normal with osteoarthritis

degenerative changes at several levels, and a large disc/osteophyte complex at C5-C6 on the left

side encroaching on the nerve root foramen."  Shelton Aff. ¶ 39.  "The Lumbar MRI showed

degenerative disc changes with a disc protrusion at L4-5 without root impingement, L5-S1 disc

protrusion with contact with the nerve root without displacement or compression."  *Id.*  Dr.

Anthony Pappas, who performed the MRI, noted that, while the psoas mass appeared to be

benign, it had grown since plaintiff's November 2008 MRI and suggested a possible

percutaneous needle biopsy.  TLCC Records, Att. 2, Shelton Aff., at 363.  It does not appear

from the record that such a biopsy was ever performed.

## VI.    SRCI: August 12, 2009, to September 24, 2009

On August 12, 2009, plaintiff was transferred from OSP to SRCI.  Complaint at 13, 27.

The bus ride caused plaintiff substantial pain.  *Id.* at 13.  While at SRCI, plaintiff saw Dr. Gulick

three times requesting treatment for his lumbar-spine and cervical-spine pain.  Complaint at 13,

27-28; Shelton Aff. ¶ 40.  Although plaintiff alleges that Dr. Gulick told him that "he was not

[going] to receive surgery and that there was nothing wrong with him," Complaint at 27, it

appears that Dr. Gulick referred the case to the TLCC for review, requested a shower chair on

---

[18]  The Medication Administration Records note that plaintiff's indomethacin was "ok in cell."  Medication Administration Records, Att. 2, Shelton Aff., at 238.  I interpret this to mean it is a self-administered medication, thus explaining why there is no record of when plaintiff took the medication in the Medication Administration Records.

plaintiff's behalf, and requested approval of a prescription for Neurontin. Shelton Aff. ¶ 40; TLCC Records, Att. 2, Shelton Aff., at 366-67. The TLCC denied Dr. Gulick's request for approval of a prescription for Neurontin but granted the request for a shower chair. Shelton Aff. ¶ 40; TLCC Records, Att. 2, Shelton Aff., at 366-67. The TLCC also approved another outside consultation with Dr. Buza. Shelton Aff. ¶ 40.

**VII.    OSP: September 24, 2009, to October 7, 2009**

On September 24, 2009, plaintiff was transferred from SRCI to OSP for an appointment with Dr. Buza. Complaint at 13, 28; Shelton Aff. ¶ 41. The bus ride caused plaintiff substantial pain. Complaint at 13, 28. On September 28, 2009, plaintiff saw Dr. Buza. *Id.*; Shelton Aff. ¶ 42; TLCC Records, Att. 2, Shelton Aff., at 368-71. Dr. Buza recommended steroid injections for plaintiff's lower back. Complaint at 13; Shelton Aff. ¶ 42; TLCC Records, Att. 2, Shelton Aff., at 371.

Plaintiff remained at OSP until October 7, 2009. Complaint at 14, 28. During his approximately two-week stay, he sought treatment for pain, but the medical staff refused to allow plaintiff to see a doctor. *Id.*

**VIII.    SRCI: October 7, 2009, to December 16, 2009**

On October 7, 2009, plaintiff was transferred from OSP to SRCI. Complaint at 14, 28. Once again, the bus ride caused plaintiff to suffer substantial pain. *Id.* at 14. "Plaintiff made it clear to both Dr. Gulick and Dr. Hansen that these repeated bus rides were [causing] him a substantial amount of pain and requested that they place a medical hold on him that would allow him to remain at the same institution [until] treatment was completed," but Dr. Gulick and Dr. Hansen denied plaintiff's request for a medical hold. *Id.* Although Dr. Shelton alleges that

plaintiff was transferred to SRCI "for mental health screening," Shelton Aff. ¶ 43, plaintiff

alleges that the "repeated transports" he was subjected to "are what are known as diesel treatment

and are designed to punish inmates who file [lawsuits], grievances, etc."  Complaint at 14.

Beginning in approximately October 2009, plaintiff "began sending inmate

[communications] to everyone and anyone," including Williams, Gower, Dr. Shelton, Hoefel,

Hodge, and Nooth to request treatment for pain.  *Id.* at 14; *see also id.* at 30; Exs. 6-11,

Resistance to Motion for Summary Judgment.

On October 9, 2009, shortly after plaintiff arrived at SRCI, Dr. Gulick requested that the

TLCC approve the steroid injections for plaintiff's lumbar-spine pain in accordance with Dr.

Buza's recommendation.  TLCC Records, Att. 2, Shelton Aff., at 372.  The TLCC did not grant

or deny the request but instead asked for additional records.  *Id.*  On October 13, 2009, Dr.

Gulick also requested that the TLCC approve a further consultation with Dr. Buza, an "LE NCV

& EMG," and a right wrist splint, all of which the TLCC approved.  Shelton Aff. ¶ 43; TLCC

Records, Att. 2, Shelton Aff., at 373.

Meanwhile, plaintiff continued to see Dr. Gulick throughout October and November

2009.  Complaint at 14-15, 28-29; Shelton Aff. ¶ 44.  On one visit, plaintiff confronted Dr.

Gulick "about a medication request he submitted where he lied about the diagnosis."  Complaint

at 14-15.  Dr. Gulick changed the request "right in [front] of plaintiff, in an attempt to cover the

lie."[19]  *Id.* at 15.  Dr. Gulick would not give plaintiff any pain medication except Pamelor and

---

[19]  Plaintiff is presumably referencing Dr. Gulick's September 2008 request to the TLCC
to prescribe Neurontin.  TLCC Records, Att. 2, Shelton Aff., at 366.  The original diagnosis,
which read "psoas tumor," is crossed out and replaced with "neck & [illegible]."  *Id.*  Plaintiff
does not explain how the original diagnosis of "psoas tumor" is a "lie," as a November 28, 2008
MRI revealed a "2.3 cm mass within the left psoas muscle."  TLCC Records, Att. 2, Shelton Aff.,

Tegretol—medications to which plaintiff previously had an adverse reaction.[20]  *Id.*; Medication

Administration Records, Att. 2, Shelton Aff., at 240-41 (showing prescriptions for Pamelor and

Tegretol).  Dr. Gulick also told plaintiff that he "did not need" the steroid injections Dr. Buza

had recommended.[21]  Complaint at 15 (internal quotation mark omitted).  Furthermore, during

one of these visits, Dr. Gulick told plaintiff that plaintiff's neck pain "did not matter and could

not be treated." *Id.* at 29.  On another visit, Dr. Gulick lamented that plaintiff's blood pressure

was too low for Dr. Gulick to prescribe medication for plaintiff's headaches.  *Id.* at 30.  Plaintiff,

however, had recently had his blood pressure checked and knew it was not too low.  *Id.*

On November 17, 2009, Dr. Gulick spoke with Dr. Buza regarding plaintiff's condition.

Shelton Aff. ¶ 45.  "Dr. Buza and Dr. [Gulick] both expressed discomfort with [plaintiff's]

symptoms not matching up to his MRIs."[22]  *Id.*  Nevertheless, the TLCC approved another

consultation with Dr. Buza.  *Id.*; *see also* Complaint at 31 (noting that Dr. Gulick told plaintiff he

would be going back to see Dr. Buza).  The TLCC also approved a prescription for Imitrex to

treat plaintiff's headaches, Shelton Aff. ¶ 45, although plaintiff stated that the Imitrex made him

sick.  Complaint at 31.

---

at 331.

[20]  Plaintiff does not explain what "adverse reaction" he had to the medications.  The
Medication Administration Records indicate that plaintiff has no known drug allergies. *See, e.g.*,
Medication Administration Records, Att. 2, Shelton Aff., at 240-41.

[21]  As noted above, Dr. Gulick requested that the TLCC approve the steroid injections on
October 9, 2009; however, it appears that the TLCC never granted or denied the request.  TLCC
Records, Att. 2, Shelton Aff., at 372.

[22]  Dr. Shelton's affidavit states that "Dr. Buza and Dr. Becker both expressed discomfort
with [plaintiff's] symptoms not matching up to his MRIs."  Shelton Aff. ¶ 45.  This appears to be
an error.  There is no indication in the record that Dr. Becker was involved with plaintiff's
medical care after the January 27, 2009 examination.

On December 1, 2009, plaintiff saw Dr. Gulick again, "who was angry" and stated "that plaintiff's treatment was out of his hands." Complaint at 15; *accord id.* at 31; *see also* Shelton Aff. ¶ 46 ("On December 1, 2009, [plaintiff] was evaluated by Dr. Gulick with no changes in the inmate's neck and back complaints."). For the next weeks that plaintiff was at SRCI, the nursing staff refused to let him see Dr. Gulick. Complaint at 15, 31.

On December 3, 2009, plaintiff received the EMG and NCV that the TLCC had approved in October 2009. Shelton Aff. ¶ 47. The EMG and NCV, which was of plaintiff's lower right extremity, "returned essentially normal test results." *Id.*

## IX.    OSP: December 16, 2009, to August 11, 2010

On December 16, 2009, plaintiff was transferred from SRCI to OSP for his upcoming appointment with Dr. Buza. Complaint at 15; Shelton Aff. ¶ 48. When he arrived at OSP, "plaintiff was given papers to sign authorizing lumbar spinal surgery, [and] blood and urine samples were taken for the surgery." Complaint at 16. "On December 23, 2009, plaintiff received surgery on his 4th and 5th lumbar, with laminectomy of L4-5 with fusion of L4-5, arthrodesis, and fusion." Shelton Aff. ¶ 49; *see also* Complaint at 16; TLCC Records, Att. 2, Shelton Aff., at 380-91. "Within days of [plaintiff's] lumbar spinal surgery[,] there was a huge improvement in plaintiff's ability to walk, stand, etc." Complaint at 16.

On December 27, 2009, plaintiff was discharged from the hospital and returned to OSP. *Id.*; *see also* TLCC Records, Att. 2, Shelton Aff., at 391. Shortly after his arrival at OSP, Dr. Vargo "discontinued" some of plaintiff's pain medications. Complaint at 16; *see also* Physician's Orders, Att. 2, Shelton Aff., at 75. Plaintiff, however, remained on several other pain medications, including Neurontin and Vicodin, for several months after his lumbar-spine

surgery.  *See* Medication Administration Records, Att. 2, Shelton Aff., at 245-57.  Shortly after

his lumbar-spine surgery, Nurse Myers "would not allow plaintiff to have the walker that Dr.

Buza and Dr. Degner had ordered him to use" following the surgery.  Complaint at 48.

Beginning in early January 2010, Dr. Hansen oversaw plaintiff's recovery.  Shelton Aff. ¶

50.  Although plaintiff reported that he was in considerable pain and requested more pain

medication, a nurse noted that plaintiff "did not exhibit any symptoms of pain or discomfort and

moved without any problems."  *Id.*

On January 19, 2010, and February 8, 2010, plaintiff had follow-up appointments with

Dr. Buza.  Complaint at 32; Shelton Aff. ¶¶ 52, 54; TLCC Records, Att. 2, Shelton Aff., at 393-

400.  Dr. Buza reported that plaintiff was doing well post-operatively.  When he returned from

the January 19, 2010 appointment, Nurse Myers would not allow plaintiff to have his pain

medication.  Complaint at 48-49.  At the February 8, 2010 appointment, Dr. Buza indicated that

plaintiff "might now benefit from cervical spine surgery to treat his cervical spondylosis and

radiculopathy."  Shelton Aff. ¶ 54; *see also* Complaint at 32; TLCC Records, Att. 2, Shelton

Aff., at 400.

Meanwhile, Dr. Hansen continued to monitor plaintiff at OSP.  Shelton Aff. ¶ 53.

Throughout January, February, March, and April 2010, Plaintiff complained of "persistent neck,

back, and migraine pain."  *Id.* ¶¶ 53, 55; *see also* Complaint at 32.  Throughout this period, Dr.

Hansen prescribed Ultram, an increased dosage of Neurontin, and Vicodin to treat plaintiff's pain

and referred plaintiff's case to the TLCC.  Shelton Aff. ¶¶ 53, 55; Medication Administration

Records, Att. 2, Shelton Aff., at 251-52; TLCC Records, Att. 2, Shelton Aff., at 401.  On March

12, 2010, plaintiff saw Nurse Hinkleman.  Complaint at 49.  "[P]laintiff had to give . . . [N]urse

Page 19 - OPINION AND ORDER

Hinkleman a page from his own medical file because the page was missing from his ODOC

Medical File, so that [the TLCC] could look at the page." *Id.* On March 17, 2010, Nurse Young

"would not give plaintiff his headache medication in the way that Dr. Hansen had prescribed it."

*Id.* Sometime in late March 2010, plaintiff spoke with Jeff Premo, the OSP Superintendent, and

requested cervical-spine surgery. *Id.* at 32, 49-50. Premo "made a joke about [p]laintiff's neck,

and said how he did not like [p]laintiff's face, but that did not mean he would get surgery for it."

*Id.* at 32; *accord id.* at 49-50.

On April 1, 2010, the TLCC approve an anterior cervical fusion. *See* TLCC Records,

Att. 2, Shelton Aff., at 403; Shelton Aff. ¶ 55; Complaint 32. On April 14, 2010, while plaintiff

was in his cell, Nurse Young loudly explained "how to use [rectal] suppositories," causing "the

entire tier of inmates to erupt in laughter, as well as[] the Correctional Officer that was

escorting" Nurse Young. Complaint at 49.

On May 21, 2010, Dr. Buza performed the anterior cervical fusion. TLCC Records, Att.

2, Shelton Aff., at 409-11, 414-15. Following the surgery, plaintiff's pain in his left shoulder and

arm was gone but he experienced "an incredible pain in his right shoulder and arm." Complaint

at 33; *see also* TLCC Records, Att. 2, Shelton Aff., at 417 (noting that when plaintiff woke up

from surgery, he reported pain in his right shoulder and numbness and tingling in the fourth

finger on the right side). Shortly after plaintiff returned to OSP from the hospital, plaintiff's pain

medication was "changed to a much less effective medication."[23]  Complaint at 33. Sometime in

---

[23]  I note that the Medication Administration Records for May 2010 are missing from the
record.  The June 2010 Medication Administration Records, however, show that plaintiff was on
Neurontin and Vicodin for the entire month.  Medication Administration Records, Att. 2, Shelton
Aff., at 258-59.

June 2010, Nurse Hinkleman "allowed plaintiff's [pain] medication to expire." *Id.* at 50. Nurse

Hinkleman's only response was, "[Y]ou wouldn't have [it] if I had been here." *Id.* (internal

quotation mark omitted). Plaintiff saw Dr. Hansen throughout June and July, complaining of

"persistent shoulder pain, neck pain, fibromyalgia, and rectal bleeding." Shelton Aff. ¶¶ 57-58.

Dr. Hansen prescribed Vicodin and Neurontin for plaintiff's reported pain. *Id.*; *see also*

Medication Administration Records, Att. 2, Shelton Aff., at 258-63.

On August 3, 2010, plaintiff had a follow-up appointment with Dr. Buza. Complaint at

33; Shelton Aff. ¶ 59; TLCC Records, Att. 2, Shelton Aff., at 417-18. Dr. Buza reported that

plaintiff was doing well post-operatively but noted that plaintiff complained of pain in his right

shoulder, numbness and tingling in his fourth finger on the right side, and low back pain. TLCC

Records, Att. 2, Shelton Aff., at 417-18. Dr. Buza recommended carpal tunnel surgery on

plaintiff's right wrist. *Id.* at 418. He also noted that plaintiff "may be a candidate for anterior

cervical fusion at C6-7" but stated that such surgery "is too soon." *Id.* Dr. Buza suggested that

"an injection of the SI joints" may be appropriate. *Id.* Finally, Dr. Buza recommended another

form of pain medication. *Id.* Following his appointment with Dr. Buza, plaintiff attempted to

see Dr. Hansen "to discuss a treatment plan." Complaint at 33. However, plaintiff "was refused

an appointment." *Id.*

## X.   SRCI: August 11, 2010, to March 23, 2011

On August 11, 2010, plaintiff was transferred from OSP to SRCI. *Id.* While Dr. Shelton

alleges that the transfer was necessary so plaintiff could attend upcoming appointments, *see*

Shelton Aff. ¶ 60, plaintiff alleges that this transfer was contrary to Assistant Director Gower's

assurance that plaintiff would not be transferred until his treatment was complete. Complaint at

16-17.  Prior to boarding the bus, Nurse Myers refused plaintiff's request for pain medication and plaintiff experienced severe pain during the bus ride.  *Id.* at 17, 33; *see also* Medication Administration Records, Att. 2, Shelton Aff., at 264 (confirming that plaintiff was not administered Neurontin or Vicodin on the morning of August 11, 2010).  Also on August 11, 2010, plaintiff's prescription for Vicodin expired.  Complaint at 33.

Once back at SRCI, plaintiff was again under the care of Dr. Gulick.  *Id.* at 34; Shelton Aff. ¶ 61.  On August 24, 2010, Dr. Gulick, without seeing or examining plaintiff, changed the frequency with which plaintiff took Neurontin.[24]  Complaint at 17, 34; Medication Administration Records, Att. 2, Shelton Aff., at 264.  On August 27, 2010,[25] plaintiff saw Dr. Gulick and confronted him as to why he had changed plaintiff's pain medication.  Complaint at 17, 34; Progress Notes, Att. 2, Shelton Aff., at 169.  Dr. Gulick told plaintiff that he "had nothing [coming] and next time [he had] better think twice about filing a [lawsuit] against [Dr. Gulick]."  Complaint at 17 (internal quotation mark omitted); *accord id.* at 34.  Plaintiff saw Dr. Gulick several times throughout September 2010.  Complaint at 18, 34; Shelton Aff. ¶ 61.  During these visits, Dr. Gulick told plaintiff that he "never should have received any treatment in the first place" and that "if he wanted any more treatment he would have to pay for it himself."  Complaint at 18; *accord id.* at 34.  On September 14, 2010, "Dr. Gulick told . . . [p]laintiff he

---

[24]  Plaintiff alleges that Dr. Gulick "discontinued" his pain medication.  Complaint at 34.  It is not clear what plaintiff means by this.  It appears that, on August 24, 2010, plaintiff began taking a higher dosage of Neurontin (800 mg rather than 600 mg) but began taking Neurontin only two times a day rather than the previously prescribed three times.  Medication Administration Records, Att. 2, Shelton Aff., at 264.

[25]  The complaint states August 31, 2010.  Complaint at 17, 34.  However, there is no record of an appointment on August 31, 2010.

would be going out for some testing on his arms, but if Dr. Gulick had his way . . . [p]laintiff would not be receiving any more treatment." *Id.* at 34. That same date, Dr. Gulick prescribed "medication for which plaintiff had already had [an] adverse reaction[] to."[26] *Id.* at 18.

On September 16, 2010, plaintiff received an EMG and NCV, "which showed mild right carpal tunnel syndrome, and features to suggest mild disturbance at C7-8 on the right side."[27] Shelton Aff. ¶ 62; *see also* Complaint at 34; TLCC Records, Att. 2, Shelton Aff., at 422. Dr. Asher, who performed the testing, recommended "imaging correlation" and a "hand surgical consultation." TLCC Records, Att. 2, Shelton Aff., at 422.

On September 21, 2010, plaintiff saw Dr. Gulick again. Complaint at 35; Shelton Aff. ¶ 63. Dr. Gulick told plaintiff "that he hopes [p]laintiff is in a lot of pain, and that . . . [p]laintiff can do whatever he wants because he is immune to lawsuits." Complaint at 35. During that same visit, Dr. Gulick prescribed Imitrex to treat plaintiff's headaches. Shelton Aff. ¶ 63; Medication Administration Records, Att. 2, Shelton Aff., at 268.

In October 2010, plaintiff received several low back joint injections, although he reported to Dr. Gulick that the injections made his pain worse. Shelton Aff. ¶¶ 64-65; *see also* Complaint at 53. In November 2010, plaintiff received another MRI of his cervical spine, "which

---

[26] It appears that the only medication Dr. Gulick prescribed on September 14, 2010, is Norvasc, which treats high blood pressure or chest pain. Physician's Orders, Att. 2, Shelton Aff., at 86; *see also* Medication Administration Records, Att. 2, Shelton Aff., at 268. I note that, on September 21, 2010, Dr. Gulick prescribed plaintiff Imitrex, which plaintiff claimed made him sick.

[27] I note that plaintiff complains that "the only tests Dr. Gulick had ordered were for his right wrist, not both arms as Dr. Gulick clearly stated." Complaint at 34. It is unclear why plaintiff needed testing on his left arm, as he reported that all the pain in his left shoulder and arm was alleviated by the May 21, 2010 surgery. *See id.* at 33.

documented post-surgical and degenerative changes." Shelton Aff. ¶ 67. Meanwhile, plaintiff

continued to complain of pain. *Id.* ¶ 69. Plaintiff received several more low back joint injections

in December 2010, but the TLCC denied a request for further injections on January 20, 2011,

because "the first two sets of injections made [plaintiff's] condition worse." *Id.* ¶ 72. On January

26, 2011, the TLCC approved an NCV for plaintiff, "opting for further testing before resorting to

a second carpal tunnel surgery." *Id.* ¶ 74. Throughout February and March 2011, plaintiff

continued to seek medical treatment for neck and back pain, as well as fibromyalgia. *Id.* ¶¶ 76-

78. Throughout this period, plaintiff remained on Neurontin, received further injections for pain,

and was prescribed Cymbalta for his fibromyalgia, although he reported that the Cymbalta made

him sick. *Id.*; Medication Administration Records, Att. 2, Shelton Aff., at 280-84; Complaint at

53.

## XI.    TRCI: March 23, 2011, to June 22, 2011

On March 23, 2011, plaintiff was transferred to TRCI. *Id.* ¶ 79. On June 22, 2011,

plaintiff filed the complaint. In the complaint, plaintiff states that he continues to suffer from

pain in his lumbar spine. Complaint at 18. The pain "keep[s] [him] awake at night, prevents him

from exercising, as well as protecting himself from other[s]." *Id.* Moreover, plaintiff "is unable

to work in any type of prison job" as a result of his lumbar-spine pain. *Id.* Plaintiff also states

that he continues to suffer from pain in his cervical spine. *Id.* at 35.

## LEGAL STANDARD

Summary judgment is appropriate if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, "show[] that there is

no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a).  Summary judgment is not proper if material factual issues exist for

trial.  *See, e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 247-48 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).

The substantive law governing a claim or defense determines whether a fact is material.  *See*

*Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 369 (9th Cir. 1998).  In evaluating a

motion for summary judgment, the district courts of the United States must draw all reasonable

inferences in favor of the nonmoving party and may neither make credibility determinations nor

perform any weighing of the evidence.  *See, e.g.*, *Reeves v. Sanderson Plumbing Prods., Inc.*,

530 U.S. 133, 150 (2000); *Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-55 (1990).

## ANALYSIS

In the motion for summary judgment, defendants argue that: (1) Claim V, which alleges

negligence and medical malpractice, is barred by the Eleventh Amendment; (2) the statute of

limitations bars plaintiff's claims arising before March 22, 2009; (3) defendants were not

deliberately indifferent to plaintiff's medical needs; (4) alternatively, defendants are entitled to

qualified immunity; and (5) if any of plaintiff's claims survive, plaintiff's requests for declaratory

and injunctive relief are inappropriate.

## I.    Claim V

Under Claim V, plaintiff alleges that defendants Dr. Gulick, Dr. Vargo, Dr. Hansen, Dr.

Becker, Nurse Gruenwald, Williams, Gower, Dr. Shelton, Hoefel, Nooth, Nurse Myers, Nurse

Hinkleman, Nurse Young, and Premo violated his Eighth Amendment right to be free from cruel

and unusual punishment when they negligently failed to "provide plaintiff with medical care for

his serious medical needs."  Complaint at 39.  Defendants move to dismiss Claim V on the basis

that it is a state-law claim that "can only be brought against the State of Oregon, not individually

named defendants."  Mem. in Support of Motion for Summary Judgment at 21.  Defendants

argue that the State of Oregon should be substituted for the individually named defendants and

then dismissed because the State of Oregon is immune from suit in federal court under the

Eleventh Amendment.  Plaintiff responds that dismissal of Claim V is not appropriate because

"[t]he Eleventh Amendment does not forbid suing state official for damages in their individual

capacities and for [declaratory relief] or injunctive relief in [their] official capacities."

Resistance to Motion for Summary Judgment at 45 (citation omitted).

    I find that defendants are entitled to summary judgment on Claim V.  Claim V does not

state a constitutional claim.  "A showing of medical malpractice or negligence is insufficient to

establish a constitutional deprivation under the Eighth Amendment."  *Toguchi v. Chung*, 391

F.3d 1051, 1060 (9th Cir. 2004); *see also Estelle v. Gamble*, 429 U.S. 97, 106 (1976) ("Medical

malpractice does not become a constitutional violation merely because the victim is a prisoner.").

Even gross negligence does not rise to the level of an Eighth Amendment violation.  *Wood v.

Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990).  Thus, plaintiff cannot bring suit under 42

U.S.C. § 1983 alleging negligence or medical malpractice.  *See* 42 U.S.C. § 1983 (limiting §

1983 actions to those based on violations of constitutional or federal law).  Rather, as defendants

contend in their memorandum in support of the motion, Claim V must be considered a state-law

claim.

    Construing Claim V as a state-law claim, it is barred under the Eleventh Amendment.

Plaintiff names each defendant in his or her official and individual capacities and seeks damages,

declaratory relief, and injunctive relief.  First, the Eleventh Amendment bars a suit against state

officials in their official capacities "unless Congress has abrogated state sovereign immunity

under its power to enforce the Fourteenth Amendment or a state has waived it." *Holley v. Cal.*

*Dep't of Corrs.*, 599 F.3d 1108, 1111 (9th Cir. 2010).  Plaintiff has not suggested that either of

these circumstances exist and I am aware of no authority to support a finding that either

Congress abrogated the State of Oregon's sovereign immunity under these facts or that the State

of Oregon has consented to be sued in federal court.  Accordingly, I find that plaintiff cannot

maintain Claim V against defendants in their official capacities.  *See Howard v. Or. Dep't of*

*Corrs.*, No. 6:10-cv-06390-AA, 2013 WL 4786483, at *2-3 (D. Or. Sept. 5, 2013) (dismissing a

plaintiff's state-law claims against the defendants in their official capacities on Eleventh

Amendment grounds).

Second, the Oregon Tort Claims Act mandates that the State of Oregon be substituted for

the individually named defendants.  Pursuant to the Oregon Tort Claims Act:

> The sole cause of action for a tort committed by officers,
> employees or agents of a public body acting within the scope of
> their employment or duties and eligible for representation and
> indemnification under ORS 30.285 or 30.287 is an action under
> ORS 30.260 to 30.300.  The remedy provided by ORS 30.260 to
> 30.300 is exclusive of any other action against any such officer,
> employee or agent of a public body whose act or omission within
> the scope of the officer's, employee's or agent's employment or
> duties gives rise to the action.  No other form of civil action is
> permitted.

Or. Rev. Stat. § 30.265(2).  In this case, because plaintiff alleges that defendants were negligent

while acting within the scope of their employment duties, the State of Oregon "is substituted for

all individual state employees sought to be held liable under state law, and the State of Oregon

has Eleventh Immunity as to these claims." *Howard*, 2013 WL 4786483, at *3; *see also Estelle*,

429 U.S. at 107 ("At most it is medical malpractice, and as such the proper forum is the state

Page 27 - OPINION AND ORDER

court under the Texas Tort Claims Act."); *Olson v. Or. Univ. Sys. ex rel. Pernsteiner*, No. CV 09-167-MO, 2009 WL 1270293, at *6-7 (D. Or. May 6, 2009) (holding that the plaintiff's negligence claim was barred because "Oregon must be substituted for the individually-named defendants" and the Oregon Tort Claims Act "does not explicitly waive immunity from suit in federal court"); *Blair v. Toran*, No. CV-99-956-ST, 1999 WL 1270802, at *23 (D. Or. Dec. 2, 1999) (finding that, because the plaintiff's action arose out of "the act or omission of a state officer, employee, or agent within the course and scope of his official duties, the State of Oregon is substituted as the party defendant"), *aff'd*, 12 F. App'x 604 (9th Cir. 2001).  Accordingly, I find that plaintiff cannot maintain Claim V against defendants in their individual capacities

In his resistance, plaintiff contends that "[t]he Eleventh Amendment does not forbid suing state officials for . . . [declaratory relief] or injunctive relief in [their] official capacities." Resistance to Motion for Summary Judgment at 45.  Plaintiff is mistaken.  While the Eleventh Amendment does not bar suits for prospective relief based on violations of federal law, it does bar suits for prospective relief based on violations of *state* law, such as a negligence claim.  *See Ashker v. Cal. Dep't of Corrs.*, 112 F.3d 392, 394 (9th Cir. 1997); *Han v. U.S. Dep't of Justice*, 45 F.3d 333, 338 (9th Cir. 1995); *Flattum v. Cal. Dep't of Consumer Affairs*, No. 2:11-cv-2711 LKK GGH PS, 2013 WL 5773103, at *2-3 (E.D. Cal. Oct. 24, 2013).

Thus, in light of the foregoing, I find that defendants are entitled to summary judgment on Claim V.  I note that most of the allegations under Claim V are repeats of allegations under Claims I through IV, which allege that defendants were deliberately indifferent to plaintiff's medical needs in violation of the Eighth Amendment.  To the extent any allegation under Claim V is not repeated in Claims I through IV, I shall consider whether such allegation rises to the

level of deliberate indifference.

## II.    Statute of Limitations

Next, defendants argue that the court must grant summary judgment in their favor as to any claim arising before March 22, 2009. Specifically, defendants argue that Oregon's two-year statute of limitations applies and they note that plaintiff filed his complaint on June 22, 2011. Defendants acknowledge that "[t]he statute of limitations is tolled while [an] inmate completes the exhaustion process" and, thus, they argue that any claim arising before March 22, 2009, is barred by the two-year statute of limitations.[28] Memorandum in Support of Motion for Summary Judgment at 6 n.4. Plaintiff does not dispute that a two-year statute of limitations applies but, rather, argues that, under the continuing-violation doctrine, the statute of limitations did not begin to run until the last act that violated his constitutional rights.

"State law governs the statute of limitations period for § 1983 suits . . . ." *Douglas v. Noelle*, 567 F.3d 1103, 1109 (9th Cir. 2009). "Section 1983 claims are characterized as personal injury suits for statute of limitations purposes." *Id.* The applicable statute of limitations under Oregon law is two years. *See* Or. Rev. Stat. § 12.110(1); *see also Bonneau v. Centennial Sch. Dist. No. 28J*, 666 F.3d 577, 580 (9th Cir. 2012) (applying Oregon's "residual two-year statute of limitations for personal injury actions" to a § 1983 action). "'Although state law determines the length of the limitations period, federal law determines when a civil rights claim accrues.'" *Knox v. Davis*, 260 F.3d 1009, 1013 (9th Cir. 2001), *quoting Morales v. City of L.A.*, 214 F.3d 1151,

---

[28]    Defendants did not submit any evidence regarding how many months plaintiff spent exhausting the administrative process. *See* Memorandum in Support of Motion for Summary Judgment at 6 n.4. Defendants argue that any claim arising before March 22, 2009, is untimely; therefore, I assume that defendants concede plaintiff spent three months exhausting his administrative remedies—a figure that plaintiff does not contest.

1153-54 (9th Cir. 2000).

"The continuing tort doctrines applies to repeated instances or continuing acts of the same nature where there is no discrete act or incident that can be fairly determined to have caused the alleged harm." *McLean v. Shelton*, No. 3:11-cv-01535-AC, 2013 WL 3994760, at *6 (D. Or. Aug. 2, 2013) (citations omitted). "To assert a continuing violation for statute of limitations purposes, the plaintiff must 'allege both the existence of an ongoing policy of [deliberate indifference to his or her serious medical needs] and some non-time-barred acts taken in furtherance of that policy.'" *Shomo v. City of N.Y.*, 579 F.3d 176, 182 (2d Cir. 2009), *quoting Harris v. City of N.Y.*, 186 F.3d 243, 250 (2d Cir. 1999) (alteration in original). Although the parties have cited no Ninth Circuit case, and I am unable to find any, applying the continuing-violation doctrine to a claim alleging deliberate indifference to medical needs, this district as well as courts in other districts have applied the doctrine under such circumstances. *McLean*, 2013 WL 3994760, at *7 ("Although the Ninth Circuit has yet to apply the continuing violations doctrine to Eighth Amendment deliberate indifference claims, other circuits have done so, as have many district courts in this circuit.").

The continuing-violation doctrine, however, does not apply where the alleged harm is a "mere continuing *impact* from past violations." *Knox*, 260 F.3d at 1013 (citation omitted) (internal quotation marks omitted); *see also Pouncil v. Tilton*, 704 F.3d 568, 577-78, 581 (9th Cir. 2012) (discussing *Knox*). Moreover, the continuing-violation doctrine does not apply where the claim is "based on an independently wrongful, discrete act." *Pouncil*, 704 F.3d at 578-79. In that case, the statute of limitations runs from the date of that discrete act. *Id.*; *see also RK Ventures, Inc. v. City of Seattle*, 307 F.3d 1045, 1061 (9th Cir. 2002) ("*Morgan* overruled

previous Ninth Circuit authority holding that, if a discriminatory act took place within the limitations period and that act was 'related and similar to' acts that took place outside the limitations period, all related acts—including the earlier acts—were actionable as part of a continuing violation. *Morgan* held that 'discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges.'" (citations omitted)).

When applying the doctrine, "[e]ach defendant's conduct is separately evaluated to determine if that defendant engaged in a continuing pattern of violations." *Davis v. N.J. Dep't of Corrs.*, Civil Action No. 10-6439, 2011 WL 5526081, at *6 (D.N.J. Nov. 14, 2011), *citing Shomo*, 579 F.3d at 184; *see also Doe v. Blake*, 809 F. Supp. 1020, 1025 (D. Conn. 1992) ("Each defendant will be discussed individually for application of the 'continuing violation' theory to him or her.").

In this case, plaintiff does not allege that defendants Dr. Becker, Dr. Degner,[29] Dr. Peurini, Elliot, McLain, Smith, and Snider were involved in plaintiff's medical care after March 22, 2009. *See* Complaint at 8-9, 22-23, 42 (alleging Dr. Becker was deliberately indifferent to plaintiff's medical needs on January 27, 2009); *id.* at 36 (alleging that Dr. Degner, Dr. Peurini, Elliot, McLain, Smith, and Snider were deliberately indifferent to plaintiff's medical needs on February 5, 2009). Thus, plaintiff cannot satisfy the continuing-violation test as to these defendants. *See Knox*, 260 F.3d at 1013 (stating that, for the continuing-violation theory to

---

[29] In the complaint, plaintiff alleges that Dr. Degner "changed the pain medication that Dr. Buza had ordered" after plaintiff's May 21, 2010 surgery. Complaint at 50. However, in his resistance, plaintiff states that he intended to allege that Dr. Hansen, rather than Dr. Degner, was responsible for changing plaintiff's pain medication following his May 21, 2010 surgery. Resistance to Motion for Summary Judgment at 19. Accordingly, the complaint contains a single allegation concerning Dr. Degner—that is, that he, along with other members of the TLCC, denied plaintiff medical treatment on February 5, 2009.

apply, "one or more of the acts [must] fall[] within the limitations period" (citation omitted)

(internal quotation mark omitted)).  Although plaintiff claims that he suffered pain after March

22, 2009, as a result of these defendants' alleged wrongful conduct, the continuing-violation

doctrine does not apply where the harm is a "mere continuing *impact* from past violations."  *Id.*

(citation omitted) (internal quotation mark omitted).  Consequently, the two-year statute of

limitations bars plaintiff's claims against defendants Dr. Becker, Dr. Degner, Dr. Peurini, Elliot,

McLain, Smith, and Snider and I shall grant summary judgment in their favor.

Plaintiff alleges that defendants Dr. Shelton, Dr. Gulick, Dr. Vargo, Dr. Hansen, Nurse

Gruenwald, and Randall were involved in plaintiff's medical care before and after March 22,

2009.  Defendants argue that the court must grant summary judgment as to any claims against

these defendants arising before March 22, 2009.  Defendants contend that the continuing-

violation doctrine does not apply "[b]ecause each of [d]efendants' alleged actions occurring after

March 2009 triggered discrete limitation periods[] [and] the statute of limitations on [p]laintiff's

pre-March 2009 claims against these [d]efendants has run."  Supplemental Brief in Support of

Motion for Summary Judgment at 6.  I find it is unnecessary to determine whether the

continuing-violation doctrine applies because, as discussed below, even if I consider these

defendants' pre-March 22, 2009 conduct, I find that plaintiff has failed to establish that

defendants were deliberately indifferent to his medical needs.

## III.    Constitutional Violation

The Supreme Court has established that a public official's "deliberate indifference to a

prisoner's serious illness or injury" violates the Eighth Amendment's prohibition against cruel

and unusual punishment.  *Estelle*, 429 U.S. at 105.  To prevail on an Eighth Amendment

deliberate-indifference claim, a prisoner must establish both (i) that he suffered an objectively serious illness or injury while incarcerated and (ii) that prison officials were subjectively aware of the seriousness of the condition and deliberately denied or delayed access to medical care that could reasonably have been provided. *See Clement v. Gomez*, 298 F.3d 898, 904-05 (9th Cir. 2002). The objective component is satisfied "whenever the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Id.* at 904 (citation omitted) (internal quotation marks omitted).

Under applicable Ninth Circuit case law, "[a] determination of 'deliberate indifference' involves an examination of two elements: the seriousness of the prisoner's medical need and the nature of the defendant's response to that need." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997). A finding of "deliberate indifference" necessarily requires "inquiry into a prison official's state of mind." *Farmer v. Brennan*, 511 U.S. 825, 838 (1994), *quoting Wilson v. Seiter*, 501 U.S. 294, 299 (1991). Specifically, the United States Supreme Court has defined "deliberate indifference" in the Eighth Amendment context to mean that "a prison official cannot be found liable . . . for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

Moreover, under applicable Ninth Circuit jurisprudence, "there are certain [additional] minimum requirements before deliberate indifference can be established." *McGuckin*, 974 F.2d at 1060.

First, there must be a purposeful act or failure to act on the part of the defendant. "An *accident*, although it may produce added anguish, is not on that basis *alone* to be characterized as wanton infliction of unnecessary pain" sufficient to demonstrate deliberate indifference, [*Estelle*], 429 U.S. at 105 . . . (emphases added), nor does "an *inadvertent* failure to provide adequate medical care" by itself to create a cause of action under § 1983. *Id.* A defendant must purposefully ignore or fail to respond to a prisoner's pain or possible medical need in order for deliberate indifference to be established.

Second, when, as here, a claim alleges "mere delay of surgery," a prisoner can make "no claim for deliberate medical indifference unless the denial was harmful." *Shapley v. Nevada Board of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985) (per curiam). However, a finding that the defendant's activities resulted in "substantial" harm to the prisoner is not necessary, see *Wood*, 900 F.2d at 1339-40; *see also* [*Hudson v. McMillian*, 503 U.S. 1, 8-10 (1992)] (rejecting "significant injury" requirement and noting that the Constitution is violated "whether or not significant injury is evident"), although a finding that the inmate was seriously harmed by the defendant's action or inaction tends to provide additional *support* to a claim that the defendant was "deliberately indifferent" to the prisoner's medical needs: the fact that an individual sat idly by as another human being was seriously injured despite the defendant's ability to prevent the injury is a strong indicium of callousness and deliberate indifference to the prisoner's suffering. *See* [*Estelle*], 429 U.S. at 106 . . . (holding that a defendant's action or inaction could be "sufficiently harmful to evidence deliberate indifference to serious medical needs"); *Ortiz v. City of Imperial*, 884 F.2d 1312, 1313-14 (9th Cir. 1989) (reversing summary judgment in part because inaction of doctors and nurses resulted in inmate's death).

*Id.* (footnote omitted). Nevertheless, "[t]he requirement of deliberate indifference is less stringent in cases involving a prisoner's medical needs than in other cases involving harm to incarcerated individuals because '[t]he State's responsibility to provide inmates with medical care ordinarily does not conflict with competing administrative concerns.'" *Id.*, *quoting Hudson*, 503 U.S. at 6 (alteration in original).

Page 34 - OPINION AND ORDER

After a thorough review of the record, I find that, for the reasons set forth below, no reasonable jury could conclude that defendants were deliberately indifferent to plaintiff's medical needs.

### A.    Dr. Shelton

In the complaint, plaintiff alleges that Dr. Shelton was deliberately indifferent to his medical needs when: (1) on February 27, 2008, Dr. Shelton, as a member of the TLCC and as the medical director for ODOC, denied plaintiff surgery; (2) on February 5, 2009, Dr. Shelton, as a member of the TLCC and as the medical director for ODOC, denied plaintiff surgery; (3) on June 30, 2009, Dr. Shelton, as a member of the TLCC and as the medical director for ODOC, denied plaintiff surgery and treatment; (4) on August 19, 2009, Dr. Shelton, as a member of the TLCC and as the medical director for ODOC, denied plaintiff surgery; (5) on September 9, 2009, Dr. Shelton, as a member of the TLCC and as the medical director for ODOC, denied plaintiff pain medication; and (6) in around October 2009, Dr. Shelton did not respond to plaintiff 's inmate communication regarding his painful lumbar-spine and cervical-spine conditions. Plaintiff contends that the delayed treatment was harmful because he was in considerable pain.

Plaintiff's allegations are insufficient to survive summary judgment. Significantly, plaintiff failed to include any allegations concerning Dr. Shelton's state of mind. *See Clement*, 298 F.3d at 904-05 (providing that a prison official must be subjectively aware of the seriousness of the condition and deliberately deny or delay access to medical care that could reasonably have been provided). Nor does the record support an inference that Dr. Shelton acted in conscious disregard of plaintiff's medical needs. Rather, the record shows that Dr. Shelton, as a member of the TLCC, carefully monitored plaintiff's condition, approved various diagnostic and radiology

studies, and approved three separate surgeries.  *See* Shelton Aff. ¶¶ 7-8.  In his affidavit, Dr.

Shelton explains that the TLCC opted for a conservative course of treatment because several of

plaintiff's treating physicians reported difficulties in assessing plaintiff's condition in light of his

"propensity of histrionics."  *See, e.g.*, *id.* ¶¶ 9, 22, 25-26, 37.  Medical staff also noted that, while

plaintiff often complained of pain, he also exhibited behaviors inconsistent with his reported

level of pain.  *See, e.g.*, *id.* ¶¶ 28, 80.  Moreover, while plaintiff complains that the TLCC denied

him surgery on various occasions despite outside consultants recommending surgery, plaintiff's

various doctors were not in agreement as to the proper course of treatment.  *E.g.*, *compare* TLCC

Records, Att. 2, Shelton Aff., at 292 (letter dated December 21, 2007, from Dr. Foote

recommending "a C5-C6 anterior cervical diskectomy and fusion with external bone graft," a

"right ulnar nerve decompression," and a "right carpal tunnel release"), *with id.* at 312 (letter

dated March 24, 2008, from Dr. Buza recommending "a nerve conduction velocity, EMG of the

left arm and an MRI of the lower lumbar spine"), *and id.* at 321 (letter dated July 7, 2008, from

Dr. Buza recommending "decompression of the median nerve on the left side").  Although it is

clear that plaintiff disagrees with many of Dr. Shelton's medical decisions, plaintiff presents no

evidence that such decisions were "medically unacceptable."  *Jackson v. McIntosh*, 90 F.3d 330,

332 (9th Cir. 1996); *cf. Snow v. McDaniel*, 681 F.3d 978, 986-87 (9th Cir. 2012) (finding that

there was a genuine issue of material fact as to whether the defendants were deliberately

indifferent to plaintiff's medical needs where outside specialists and the plaintiff's treating

physicians all recommended the same corrective surgery).  Even if Dr. Shelton were incorrect in

his assessment of plaintiff's condition, this does not amount to an Eighth Amendment violation.

*See Wilhelm v. Rotman*, 680 F.3d 1113, 1123 (9th Cir. 2012) (explaining that, because the

defendant did not believe that the plaintiff was suffering from a hernia, the defendant's decision to not operate was a mere "negligent misdiagnosis" rather than deliberate indifference). Accordingly, I find that Dr. Shelton is entitled to summary judgment in his favor.

### B.    Dr. Gulick

A substantial portion of plaintiff's complaint is comprised of allegations against Dr. Gulick. Plaintiff generally alleges that Dr. Gulick did not adequately treat plaintiff's lumbar-spine and cervical-spine conditions and failed to adequately treat plaintiff's pain. Specifically, plaintiff alleges that Dr. Gulick refused to examine plaintiff, prescribed ineffective pain medication, refused to order a medical hold on plaintiff, prescribed medications plaintiff had previously had adverse reactions to, lied about plaintiff's diagnosis, ordered diagnostic and radiology tests on the wrong side of plaintiff's body, and refused to follow other doctors' recommendations. Plaintiff also claims that Dr. Gulick, as a member of the TLCC, denied plaintiff corrective surgery and pain medication. Throughout plaintiff's complaint, he alleges that Dr. Gulick commented, among other things, that plaintiff "had nothing [coming] and next time [he had] better think twice about filing a [lawsuit] against [Dr. Gulick]," that "if [plaintiff] wanted any more treatment he would have to pay for it himself," and "that he hopes [p]laintiff is in a lot of pain, and that . . . [p]laintiff can do whatever he wants because [Dr. Gulick] is immune to lawsuits." Complaint at 17-18, 35.

Although a close question, I find that plaintiff's allegations are insufficient to survive summary judgment. The record reveals that Dr. Gulick regularly saw plaintiff, prescribed various pain medications in response to plaintiff's complaints of pain, and frequently referred plaintiff's case to the TLCC with requests for testing, surgery, and medication. *See, e.g.*, Shelton

Aff. ¶¶ 11, 34, 40, 43-46, 61, 63, 65, 68-69, 73, 76, 78.  I am, however, troubled by Dr. Gulick

alleged remarks to plaintiff, including a remark that he "hopes [p]laintiff is in a lot of pain."

Complaint at 35.  Nevertheless, while these may be "textbook example[s] of the state of mind

required to violate the Eighth Amendment," *Snow*, 681 F.3d at 990, Dr. Gulick's actions are

entirely inconsistent with the alleged statements.  Thus, while it is clear that plaintiff disagrees

with many of Dr. Gulick's medical decisions, plaintiff presents no evidence that such decisions

were "medically unacceptable."  *Jackson*, 90 F.3d at 332.  Accordingly, I shall grant summary

judgment in Dr. Gulick's favor.

**C.    Dr. Hansen**

In the complaint, plaintiff alleges that: (1) from about September 2008 to February 2009,

Dr. Hansen refused to adequately treat plaintiff's lumbar-spine and cervical-spine conditions; (2)

Dr. Hansen refused to place plaintiff on stair restrictions, causing plaintiff a substantial amount

of pain in his lumbar spine; (3) on February 5, 2009, Dr. Hansen, as a member of the TLCC,

denied plaintiff medical treatment; (4) between approximately July 2009 and September 2009,

plaintiff saw Dr. Hansen three times in six weeks but Dr. Hansen did not adequately treat

plaintiff's pain; (5) Dr. Hansen denied plaintiff's request for a medical hold so that plaintiff could

avoid bus rides between institutions that caused him severe pain; (6) on August 5, 2010, after

plaintiff's cervical-spine surgery on May 21, 2010, plaintiff attempted to see Dr. Hansen to

discuss a treatment plan regarding pain that had developed in his right shoulder and arm

following the surgery, but Dr. Hansen refused to see him; and (7) after Dr. Hansen diagnosed

plaintiff with fibromyalgia, Dr. Hansen refused to adequately treat plaintiff's pain.

Plaintiff's allegations are insufficient to survive summary judgment.  Significantly,

plaintiff failed to include any allegations concerning Dr. Hansen's state of mind. *See Clement*, 298 F.3d at 904-05 (providing that a prison official must be subjectively aware of the seriousness of the condition and deliberately deny or delay access to medical care that could reasonably have been provided). Nor does the record support an inference that Dr. Hansen acted in conscious disregard of plaintiff's medical needs. To the contrary, plaintiff's medical records show that Dr. Hansen saw plaintiff numerous times, that plaintiff was on various pain medications while under the care of Dr. Hansen, and that Dr. Hansen referred plaintiff's case to the TLCC on various occasions. *See* Shelton Aff. ¶¶ 18-19, 22, 37-38, 50-51, 53, 55, 57-58; *see also, e.g.*, Progress Notes, Att. 2, Shelton Aff., at 112-15 (showing appointments with Dr. Hansen on September 16, 2008, October 9, 2008, October 28, 2008, and January 6, 2009); Physician's Orders, Att. 2, Shelton Aff., at 58 (showing that plaintiff was on Neurontin in September 2008); Medication Administration Records, Att. 2, Shelton Aff., at 217-28 (showing that plaintiff was on Neurontin and, at times, Vicodin (or hydrocodone) from October 2008 to February 2009); Medication Administration Records, Att. 2, Shelton Aff., at 217-28 (showing that plaintiff was on indomethacin from July 2009 to September 2009). Moreover, the medical records document that Dr. Hansen responded to plaintiff's complaints of pain by, for example, increasing his dosage of Neurontin and prescribing Vicodin. *See* Medication Administration Records, Att. 2, Shelton Aff., at 217-20, 224. Although it is clear that plaintiff disagrees with many of Dr. Hansen's medical decisions, plaintiff presents no evidence that such decisions were "medically unacceptable." *Jackson*, 90 F.3d at 332. Accordingly, I find that Dr. Hansen is entitled to summary judgment in his favor.

///

Page 39 - OPINION AND ORDER

### D.    Dr. Vargo

With regard to Dr. Vargo, plaintiff alleges that: (1) after he was transferred to OSP on February 27, 2008, Dr. Vargo allowed his pain medication to expire; (2) Dr. Vargo refused to see plaintiff from February 27, 2008, to September 2008; (3) on February 5, 2009, Dr. Vargo, as a member of the TLCC, denied plaintiff surgery; (4) following plaintiff's lumbar-spine surgery on December 23, 2009, Dr. Vargo discontinued plaintiff's medication for pain and muscle spasms "without speaking to . . . plaintiff, or for any other legitimate reason," Complaint at 16; and (5) following plaintiff's surgery on May 21, 2010, Dr. Vargo reduced plaintiff's pain medication to a dose that was ineffective in managing plaintiff's pain.

Plaintiff's allegations are insufficient to survive summary judgment.  Significantly, plaintiff failed to include any allegations concerning Dr. Vargo's state of mind.  *See Clement*, 298 F.3d at 904-05 (providing that a prison official must be subjectively aware of the seriousness of the condition and deliberately deny or delay access to medical care that could reasonably have been provided).  Nor does the record support an inference that Dr. Vargo acted in conscious disregard of plaintiff's medical needs.  From February 2008 through September 2008, plaintiff was consistently on Neurontin and, at times, Vicodin.  *See* Physician's Orders, Att. 2, Shelton Aff., at 54-55, 58; Medication Administration Records, Att. 2, Shelton Aff., at 209-16.  Indeed, it appears as though the prescribed dosage of Neurontin increased during a portion of this period. *See* Medication Administration Records, Att. 2, Shelton Aff., at 212-13 (showing an increase from 600 mg to 800 mg).  Moreover, plaintiff's complaints that Dr. Vargo, as a member of the TLCC, denied plaintiff surgery and that Dr. Vargo decreased plaintiff's pain medication to a less effective dosage do not amount to an Eighth Amendment violation.  Although it is clear that

plaintiff disagrees with Dr. Vargo's medical decisions, plaintiff presents no evidence that such decisions were "medically unacceptable." *Jackson*, 90 F.3d at 332. Accordingly, I find that Dr. Vargo is entitled to summary judgment in his favor.

  **E.**  **Dr. Elliot-Blakeslee**

  In the complaint, plaintiff alleges that Dr. Elliot-Blakeslee was deliberately indifferent to his medical needs when Dr. Elliot-Blakeslee, as a member of the TLCC, denied a request for surgery and a request for pain medication.

  Plaintiff's allegations are insufficient to survive summary judgment. Significantly, plaintiff failed to include any allegations concerning Dr. Elliot-Blakeslee's state of mind. *See Clement*, 298 F.3d at 904-05 (providing that a prison official must be subjectively aware of the seriousness of the condition and deliberately deny or delay access to medical care that could reasonably have been provided). Nor does the record support an inference that Dr. Elliot-Blakeslee acted in conscious disregard of plaintiff's medical needs. Plaintiff's complaints that Dr. Elliot-Blakeslee, as a member of the TLCC, denied plaintiff surgery and pain medication do not amount to an Eighth Amendment violation. Although it is clear that plaintiff disagrees with Dr. Elliot-Blakeslee's medical decisions, plaintiff presents no evidence that such decisions were "medically unacceptable." *Jackson*, 90 F.3d at 332. Moreover, plaintiff's own complaint suggests that Dr. Elliot-Blakeslee was quite attentive to plaintiff's medical needs. For example, plaintiff alleges that, on January 26, 2011, Dr. Elliot-Blakeslee examined plaintiff for over an hour, diagnosed him with fibromyalgia, and thereafter gave plaintiff steroid injections to treat his fibromyalgia pain. Complaint at 53; *see also* Shelton Aff. ¶ 77 (noting that Dr. Elliot-Blakeslee treated plaintiff for fibromyalgia pain). In light of the record, I find that Dr. Elliot-Blakeslee is

entitled to summary judgment in her favor.

**F.    Nurse Gruenwald**

In the complaint, plaintiff alleges that Nurse Gruenwald was deliberately indifferent to his medical needs from approximately March 13, 2009, through May 2009.  Specifically, plaintiff alleges that: (1) on or about March 13, 2009, Nurse Gruenwald discontinued plaintiff's headache medication, which had been ordered by a doctor; (2) on April 15, 2009, plaintiff saw Nurse Gruenwald, who denied plaintiff access to a doctor, "smacked [p]laintiff on top of the head and told [p]laintiff there was nothing wrong with him," Complaint at 24; (3) following his April 15, 2009 appointment, Nurse Gruenwald discontinued plaintiff's prescription for Neurontin in retaliation for plaintiff seeking treatment; (4) on April 29, 2009, plaintiff again saw Nurse Gruenwald, who "again smacked [p]laintiff on top of his head and told plaintiff that there was nothing wrong with him," *id.*; (5) on May 12, 2009, plaintiff collapsed from pain while doing exercises Nurse Gruenwald had given him; (6) after plaintiff returned to TRCI after collapsing, Nurse Gruenwald denied "[a]ll the medical orders written by the emergency room doctor," including removing plaintiff's cervical collar and refusing to give plaintiff pain medication, *id.* at 25; and (7) following the May 12, 2009 incident, Nurse Gruenwald refused to see plaintiff.

Although a close question, I find that plaintiff's allegations are insufficient to survive summary judgment.  Plaintiff was under the care of Nurse Gruenwald for approximately three months.  During that period, Nurse Gruenwald saw plaintiff at least twice, prescribed Indocin (or indomethacin) to treat plaintiff's reported pain, and referred the matter to the TLCC for review. *See* Shelton Aff. ¶ 29; Physician's Orders, Att. 2, Shelton Aff., at 65; Progress Notes, Att. 2, Shelton Aff., at 124.  Although Nurse Gruenwald discontinued plaintiff's prescriptions for

Vicodin and Neurontin, her actions were consistent with reports from medical staff that plaintiff did not appear to be in pain and was "cheeking" Neurontin. *See* Physician's Orders, Att. 2, Shelton Aff., at 65; Progress Notes, Att. 2, Shelton Aff., at 122.  Although it is clear that plaintiff disagrees with Nurse Gruenwald's medical decisions, plaintiff presents no evidence that such decisions were "medically unacceptable." *Jackson*, 90 F.3d at 332.  Finally, while plaintiff's allegation that Nurse Gruenwald "smacked" him on top of his head is concerning, plaintiff alleges that this occurred during the course of an examination and he does not suggest that it was done with an intent to harm.  Accordingly, I find that Nurse Gruenwald is entitled to summary judgment in her favor.

> ### G.    Nurse Hinkleman

With regard to Nurse Hinkleman, plaintiff alleges:

> On March 12, 2010, plaintiff had to give the nurse Hinkleman a page from his own medical file because the page was missing from his ODOC Medical File, so that TLC could look at the page.
>
> . . . .
>
> Nurse Patrick Hinkleman allowed plaintiff's medication to expire, [causing] plaintiff to go through several days without pain medication.  Nurse Hinkleman['s] only response was, "you wouldn't have [it] if I had been here.["]

Complaint at 49, 50.

Plaintiff's allegations are insufficient to survive summary judgment.  First, it is unclear whether plaintiff is alleging that, because he allegedly "had to give nurse Hinkleman a page from his own medical file," that Nurse Hinkleman was somehow deliberately indifferent to his medical needs.  If plaintiff is indeed alleging deliberate indifference on this basis, his argument is without merit.  Plaintiff does not identify what harm he suffered or how Nurse Hinkleman is

Page 43 - OPINION AND ORDER

responsible for the missing page.

Second, with regard to plaintiff's claim that Nurse Hinkleman "allowed plaintiff's pain medication to expire, [causing] plaintiff to go through several days without pain medication," I find that such allegation does not amount to a showing that Nurse Hinkleman was deliberately indifferent to plaintiff's medical needs.  Plaintiff does not specify the exact time frame that he went without pain medication, nor does he specify what specific pain medication Nurse Hinkleman allegedly allowed to expire.  Records reveal, for instance, that for the entire month of June 2010,[30] plaintiff received Vicodin and Neurontin (or Gabapentin).  Notably, plaintiff does not allege that Nurse Hinkleman had the authority to prescribe additional medication.  In any case, the Ninth Circuit has held that a short delay in administering pain medication does not rise to the level of deliberate indifference.  *See Frost v. Agnos*, 152 F.3d 1124, 1130 (9th Cir. 1998) (granting summary judgment on a claim arising out of a delay in administering pain medication because the plaintiff had "not established that prison officials acted with deliberate indifference in tending to his medical needs"); *Wood*, 900 F.2d at 1335 (finding that a delay in administering pain medication did not cause "substantial harm").  Accordingly, I shall grant summary judgment in favor of Nurse Hinkleman.

### H.    Nurse Young

With regard to Nurse Young, plaintiff alleges that, on March 17, 2010, Nurse Young "would not give plaintiff his headache medication in the way that Dr. Hansen had prescribed it" and, on April 14, 2010, Nurse Young loudly explained to plaintiff how to use "rectal

---

[30]  The allegations under each claim are organized in chronological order.  Thus, given the placement of this allegation in plaintiff's complaint, I assume he is alleging that Nurse Hinkleman allowed his pain medication to expire sometime in June 2010.  *See* Complaint at 50.

suppositories," which caused plaintiff embarrassment.  Complaint at 49.  I find that neither of

these claims rise to the level of an Eighth Amendment violation.  First, it is unclear what plaintiff

means when he alleges that Nurse Young "would not give [him] his headache medication in the

way that Dr. Hansen had prescribed it."  *Id.*  In any case, plaintiff has failed to allege that Nurse

Young was deliberately indifferent or that Nurse Young's alleged act of incorrectly administering

the medication caused him substantial harm.  *See Frost*, 152 F.3d at 1130 (granting summary

judgment on a claim arising out of a delay in administering pain medication because the plaintiff

had "not established that prison officials acted with deliberate indifference in tending to his

medical needs"); *Wood*, 900 F.2d at 1335 (finding that a delay in administering pain medication

did not cause "substantial harm").

Second, Nurse Young's act of loudly explaining how to use "rectal suppositories" does

not constitute deliberate indifference to plaintiff's medical needs.  While the incident may have

caused plaintiff embarrassment, it does not constitute cruel and unusual punishment within the

meaning of the Eighth Amendment.  Accordingly, I shall grant summary judgment in favor of

Nurse Young.

## I.    Nurse Myers

With regard to Nurse Myers, plaintiff alleges that: (1) in late December 2009 or early

January 2010, Nurse Myers would not allow him to have a walker that Dr. Buza and Dr. Degner

had ordered him to use; (2) on January 18, 2010, Nurse Myers refused to give plaintiff his

morning medication; and (3) on August 11, 2010, Nurse Myers refused plaintiff's request for

pain medication prior to boarding a bus.

Plaintiff's allegations are insufficient to survive summary judgment.  Significantly,

plaintiff failed to include any allegations concerning Nurse Myers's state of mind.  *See Clement*,

298 F.3d at 904-05 (providing that a prison official must be subjectively aware of the seriousness

of the condition and deliberately deny or delay access to medical care that could reasonably have

been provided).  Moreover, with regard to plaintiff's complaint that Nurse Myers would not

allow him to have a walker, plaintiff fails to allege that he needed one.  The Progress Notes state

that, by January 4, 2010, plaintiff's use of the walker was minimal.  Progress Notes, Att. 2,

Shelton Aff., at 153.  Although it is not clear when Nurse Myers removed the walker, there is no

indication that plaintiff was in need of a walker at that time.  Second, with regard to plaintiff's

allegation that Nurse Myers refused to give him pain medication on January 18, 2010, plaintiff

does not specify what medication Nurse Myers refused to give him.  The Medication

Administration Records show that plaintiff received both Neurontin and Vicodin on January 18,

2010.  Medication Administration Records, Att. 2, Shelton Aff., at 246.  In any case, the Ninth

Circuit has held that a short delay in administering pain medication does not rise to the level of

deliberate indifference.  *See Frost*, 152 F.3d at 1130 (granting summary judgment on a claim

arising out of a delay in administering pain medication because the plaintiff had "not established

that prison officials acted with deliberate indifference in tending to his medical needs"); *Wood*,

900 F.2d at 1335 (finding that a delay in administering pain medication did not cause

"substantial harm").  Accordingly, I shall grant summary judgment in favor of Nurse Myers.

### J.    Williams

In the complaint, plaintiff alleges that he sent numerous inmate communications to

Williams, the director of ODOC, informing Williams that he was in substantial pain and needed

surgery.  Specifically, plaintiff alleges that, beginning in September 2009 and continuing through

April 2010, plaintiff sent Williams at least eight inmate communications.  *See* Ex. 6, Resistance

to Motion for Summary Judgment, at 1-5; Ex. 6B, Resistance to Motion for Summary Judgment,

at 1-7.  Gower, acting on behalf of Williams, responded to three of the communications.  Ex.6B,

Resistance to Motion for Summary Judgment, at 1, 7.  The responses informed plaintiff that the

communications had been forwarded to Hoefel, the health-services administrator.  *Id.*.

In their resistance, defendants contend that the court must grant summary judgment in

favor of Williams because there is no vicarious liability under § 1983.  Plaintiff's claims against

Williams, however, are not premised on a theory of vicarious liability.  Rather, plaintiff alleges

that he sent Williams inmate communications requesting help and that Williams did not respond

appropriately.  The Ninth Circuit has held that a prisoner administrator may be "liable for

deliberate indifference when [he or she] knowingly fail[s] to respond to an inmate's requests for

help."  *Jett v. Penner*, 439 F.3d 1091, 1098 (9th Cir. 2006).  For instance, in *Jett*, the plaintiff

suffered a hand injury.  *Id.* at 1094.  Despite receiving an x-ray and seeing several doctors, the

plaintiff was not given a cast for the fracture.  *Id.* at 1094-95.  The plaintiff wrote the warden at

the prison, informing her that he had not received a cast despite his requests for medical

treatment.  *Id.* at 1095.  The warden failed to respond.  *Id.*  The Ninth Circuit found that district

court's grant of summary judgment in favor of the warden was erroneous because the plaintiff

was entitled to an inference that the warden had received the letter and the warden had a duty to

respond to the plaintiff's request for help.  *Id.* at 1098.

In this case, while Williams had a duty to respond to plaintiff's requests for medical

treatment, he is presumably not a medical professional and was in no position to know what

course of treatment was appropriate given plaintiff's complex medical issues.  Thus, Williams's

referral of the matter to Hoefel, the heath-services administrator, was an appropriate response. *See Pabon v. Ryan*, No. 05CV0283-LAB (CAB), 2007 WL 2404294, at *10-11 (S.D. Cal. Aug. 19, 2007) (dismissing a claim against a prison warden because, although the warden was aware of the plaintiff's medical condition, "[p]rison officials who are not trained medical professionals are entitled to rely on the treatment chosen by the prison doctors, unless the inadequacy of the treatment is obvious to a lay person"). Accordingly, I shall grant summary judgment in favor of Williams.

### K.    Gower

Plaintiff also alleges that he sent numerous inmate communications to Gower, the assistant director of ODOC, informing Gower that he was in substantial pain and needed surgery. Specifically, plaintiff alleges that, between October 2009 and September 2010, plaintiff sent Gower at least seven inmate communications.[31] *See* Ex. 7, Resistance to Motion for Summary Judgment, at 1-9. Gower responded to one of the communications by informing plaintiff that the communication had been forwarded to Hoefel, the health-services administrator, and that plaintiff should contact Hoefel with any further questions. *See id.* at 3. Gower responded to two other communications by alerting plaintiff that the matter was being addressed through the grievance process. *Id.* at 7-8. Plaintiff also alleges that, on January 27, 2010, in response to a grievance, Gower assured plaintiff that plaintiff would stay at OSP until his treatment was completed. Ex. 20, Resistance to Motion for Summary Judgment, at 7. Plaintiff contends that,

---

[31] Plaintiff also included a copy of an eighth inmate communication; however, that communication does not reference plaintiff's medical condition but, rather, complains that legal services would not provide certified mail services to him. *See* Ex. 7, Resistance to Motion for Summary Judgment, at 8.

contrary to Gower's assurance, plaintiff was transferred from OSP to SRCI on August 11, 2010.

Plaintiff's allegations are insufficient to survive summary judgment. While, under *Jett*, Gower had a duty to respond to plaintiff's requests for medical treatment, he is presumably not a medical professional and was in no position to know what course of treatment was appropriate given plaintiff's complex medical issues. Thus, Gower's referral of the matter to Hoefel, the heath-services administrator, was an appropriate response. *See Pabon*, 2007 WL 2404294, at *10-11.

Moreover, regarding plaintiff's complaint that he was transferred to SRCI in August 2010 despite Gower's assurance that plaintiff would remain at OSP until his treatment was complete, plaintiff has failed to allege that Gower acted with deliberate indifference. Plaintiff was transferred approximately three months after receiving cervical-spine surgery and after he had a follow-up visit with Dr. Buza. *See* TLCC Records, Att. 2, Shelton Aff., at 417-18. Moreover, Dr. Shelton avers that plaintiff was transferred to attend upcoming appointments. Shelton Aff. ¶ 60. Thus, there is nothing in the record to suggest that Gower acted with deliberate indifference to plaintiff's medical needs. Accordingly, I shall grant summary judgment in favor of Gower.

### L.    Nooth

Plaintiff also alleges that he sent numerous inmate communications to Nooth, the superintendent of SRCI, informing Nooth that he was in substantial pain and needed surgery. Specifically, between October and December 2009, plaintiff sent Nooth at least five inmate communications and, in September 2010, plaintiff sent Nooth at least one communication. *See* Ex. 8, Resistance to Motion for Summary Judgment, at 1-6. Each of the communications is marked received and referred to "health services," "medical," or Hodge. *Id.*

Page 49 - OPINION AND ORDER

Plaintiff's allegations are insufficient to survive summary judgment.  Like Williams and Gower, Nooth is presumably not a medical professional and, thus, his referral of the matter to health services, medical, or Hodge was an appropriate response.  *See Pabon*, 2007 WL 2404294, at *10-11.  Accordingly, I shall grant summary judgment in favor of Nooth.

### M.     Hoefel

In the complaint, plaintiff also alleges that he sent inmate communications to Hoefel, the health-services administrator, requesting treatment for his painful lumbar-spine and cervical-spine conditions.  Plaintiff alleges that Hoefel did not respond to any of the communications.[32]

While I am troubled by Hoefel's failure to respond to plaintiff's requests for help, plaintiff has failed to establish that Hoefel's failure to respond caused him harm.  *Estate of Brooks v. United States*, 197 F.3d 1245, 1248 (9th Cir. 1999) ("Causation is, of course, a required element of a § 1983 claim.").  As set forth above, I find that none of plaintiff's treating physicians were deliberately indifferent to his medical needs.  Thus, even if Hoefel had responded, it is unclear what he could have done under the circumstances.  Accordingly, I shall grant summary judgment in favor of Hoefel.

### N.     Randall

With regard to Randall, a medical manager at OSP, plaintiff alleges on February 5, 2009, Randall, as a member of the TLCC, denied plaintiff surgery.  Plaintiff also alleges that, from 2008 to 2010, he sent inmate communications to Randall requesting medical treatment and pain medication.  *See* Ex. 10, Resistance to Motion for Summary Judgment, at 1-6.  Randall responded to two of plaintiff's complaints by returning the communication with the note, "DO

---

[32]  Plaintiff did not provide copies of any of the communications to Hoefel.

NOT SEND THIS FORM THROUGH THE MAIL!  OBTAIN A MEDICAL/DENTAL

REQUEST FORM [AND] COMPLETE AND GIVE TO THE NURSE THAT COMES TO

YOUR UNIT."  *Id.* at 1, 4.  In response to another communication complaining that plaintiff's

pain medication was inadequate, a staff member, on behalf of Randall, wrote, "Your medication

changes made by your prescribed @ TRCI will be honored here @ OSP.  We will not be making

any changes to your medication regimen currently."  *Id.* at 3.  Randall responded to other

communications by informing plaintiff that he had a doctor's appointment scheduled or inquiring

whether he would like to schedule a doctor's appointment.  *Id.* at 5-6.

I find that plaintiff has failed to generate a genuine issue of material fact as to whether

Randall was deliberately indifferent to plaintiff's medical needs.  First, as discussed in detail

above, the TLCC's February 5, 2009 decision denying plaintiff surgery does not support an

Eighth Amendment claim.  Plaintiff has made no showing that the TLCC's decision was

"medically unacceptable," *Jackson*, 90 F.3d at 332, and Dr. Shelton has explained that the TLCC

opted for a conservative course of treatment in light of the difficulty in assessing plaintiff's

condition.  Second, there is nothing in the record suggesting that Randall was deliberately

indifferent to plaintiff's medical needs.  Randall responded to plaintiff's requests for help by

instructing plaintiff to fill out the appropriate medical form, by informing plaintiff he had an

upcoming doctor's appointment, and by asking plaintiff whether he would like to schedule a

doctor's appointment.  Plaintiff does not identify what else Randall should have done under the

circumstances.  Accordingly, I shall grant summary judgment in favor of Randall.

### O.    Hodge

With regard to Hodge, the medical manager at OSP, plaintiff alleges that, although he

sent Hodge inmate communications alerting her that he had painful lumbar-spine and cervical-spine conditions, she denied him medical treatment. Specifically, between October 13, 2009, and December 13, 2009, plaintiff sent Hodge six inmate communications. *See* Ex. 9, Resistance to Motion for Summary Judgment, at 1-6; Ex. 15, Resistance to Motion for Summary Judgment, at 4-6. Hodge responded to each inmate communication. For instance, in response to plaintiff's first communication in which he complained of pain, Hodge responded, "I sent your concerns to the TLC committee for discussion. Your records are being sent to a neurosurgeon for review." Ex. 9, Resistance to Motion for Summary Judgment, at 1; *see also* Ex. 15, Resistance to Motion for Summary Judgment, at 4 (responding to another communication by stating, "I have scheduled your case to be discussed at TLC next week"); Ex. 15, Resistance to Motion for Summary Judgment, at 5 (same). In response to plaintiff's second communication, which alleged that plaintiff's pain medication was inadequate, Hodge responded, "You are scheduled for sick call." Ex. 9, Resistance to Motion for Summary Judgment, at 2. In response to another communication, Hodge responded, "Today in TLC the committee approved a nerve conduction study for you. Hopefully, that will provide some more definitive answers to your concerns." *Id.* at 3. When plaintiff wrote to Hodge just a few days later, she reiterated, "You are currently scheduled for a nerve conduction study to determine the extent of your problems." *Id.* at 4. Plaintiff wrote again approximately a week later, inquiring whether the TLCC had approved a visit to a neurosurgeon and again alerting Hodge that he was in pain. *Id.* at 5 (noting "I would be in the Emergency Room if I was on the streets"). In response, Hodge wrote, "You will be seeing a neurosurgeon again soon." *Id.* Finally, on December 13, 2009, plaintiff asked Hodge what came of the last TLCC meeting and again alerted her that he was "hurting real bad." *Id.* at 6.

Page 52 - OPINION AND ORDER

Hodge responded, "You were referred to a specialist in Salem." *Id.*; *see also* Ex. 15, Resistance

to Motion for Summary Judgment, at 6. On December 23, 2009, plaintiff received lumbar-spine

surgery.

Upon review of the inmate communications and responses, I find plaintiff's allegations

insufficient to demonstrate that Hodge was deliberately indifferent. Hodge consistently

responded to plaintiff's complaints, referred the matter to the appropriate committee, and

reported back to plaintiff that he had been approved for a nerve conduction study and an

appointment with a specialist. Given her attention to plaintiff's concerns, I cannot conclude that

Hodge was deliberately indifferent. *See Jett*, 439 F.3d at 1096 (noting that, for a plaintiff show a

"defendant's response to the need was deliberately indifferent," the plaintiff must show "a

purposeful act or failure to respond to a prisoner's pain or possible medical need"). Accordingly,

I shall grant summary judgment in favor of Hodge.

### P.    Premo

With regard to Premo, the superintendent of SRCI, plaintiff alleges:

> In March of 2010, [he] spoke with OSP Superintendent Jeff Premo
> about getting his neck fixed. Jeff [Premo] made a joke about
> [p]laintiff's neck, and said how he did not like [p]laintiff's face, but
> that did not mean he would get surgery for it. Plaintiff handed Mr.
> Premo a communication about treatment that Dr. Buza had ordered
> on February 8, 2010.

Complaint at 32; *see also id.* at 49-50.

I find that Premo's alleged conduct does not rise to the level of a constitutional violation.

Plaintiff alleges that he talked with Premo some time in late March 2010 about "getting his neck

fixed." *Id.* at 32. On April 1, 2010, the TLCC approved an anterior cervical fusion, which was

performed on May 21, 2010. Shelton Aff. ¶¶ 55-56. In light of the fact that the surgery plaintiff

Page 53 - OPINION AND ORDER

requested was approved and performed shortly after plaintiff spoke with Premo, I fail to see how Premo was deliberately indifferent to plaintiff's medical needs. Accordingly, I shall grant summary judgment as to the claims against Premo.

### Q.    Summary

Thus, viewing the evidence in the light most favorable to plaintiff—as I am required to do at the summary-judgment stage—I find that plaintiff has failed to generate a genuine issue of material fact as to whether defendants were deliberately indifferent to his medical needs. While I am troubled by some of plaintiff's allegations against, for example, Dr. Gulick and Nurse Gruenwald, I cannot conclude that defendants violated plaintiff's Eighth Amendment rights, particularly in light of the overall medical treatment plaintiff received. Plaintiff's complaint and medical records show that, between December 2006 and June 22, 2011, plaintiff consistently saw medical staff, saw several outside specialists, had three surgeries, and was frequently prescribed pain medication. *See, e.g.*, Shelton Aff. ¶¶ 7-8 (noting that plaintiff has "had over fifty examinations by ODOC physicians, more than ten appointments with outside neurosurgeons, and more than ten radiology studies"; surgery for his carpal tunnel, cervical-spine condition, and lumbar-spine condition; and "has also received extensive and ongoing pain medications of multiple types"). "The volume and content of the medical records and the frequency of [plaintiff's] medical visits contradict [plaintiff's] subjective opinion that [defendants] purposefully ignored or failed to respond reasonably to [plaintiff's] pain or medical needs." *Daniel v. Levin*, 172 F. App'x 147, 149 (9th Cir. 2006). While plaintiff may have wished for different medical care or a more aggressive course of treatment, his allegations fall short of establishing an Eighth Amendment violation. *See Estelle*, 429 U.S. at 107 (noting that

the plaintiff "was seen by medical personnel on 17 occasions spanning a 3-month period" and concluding that, even though plaintiff claimed medical staff inadequately treated his back injury, "[a] medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment"); *see also Young v. Nooth*, No. 08-CV-1138-PK, 2011 WL 4501936, at *10-11 (D. Or. July 18, 2011) (discussing *Estelle* and concluding that the plaintiff's "belief that the care he received was inadequate is insufficient to support his Eighth Amendment claim"). Accordingly, for the reasons set forth above with regard to each defendant and viewing plaintiff's medical care as a whole, I find that defendants are entitled to summary judgment in their favor.

## VI.   Defendants' Remaining Arguments

In light of my findings above, I find it unnecessary to address defendants' argument that they are entitled to qualified immunity and their argument that plaintiff's request for declaratory and injunctive relief is inappropriate.

///

///

///

///

///

///

///

///

///

///

## CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment (#65) is granted. Plaintiff's motion for an information and status report (#108) is denied as moot. Judgment shall be entered dismissing plaintiff's complaint with prejudice.

Dated this 25th day of November, 2013.

_____/s/  Paul Papak_____
Honorable Paul Papak
United States Magistrate Judge